UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GREENACTION FOR HEALTH AND ENVIRONMENTAL JUSTICE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE NAVY et al.,<br><br>Defendants. | Case No. 3:24-cv-3899-VC<br><br>**DECLARATION OF DANIELLE JANDA IN SUPPORT OF FEDERAL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |

I, Danielle Janda, pursuant to the provisions of 28 U.S.C. § 1746, declare under penalty of perjury that the statements contained herein are true and correct.

### BACKGROUND

1. I make this Declaration in support of the Federal Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint in the above captioned matter. I make this Declaration based upon my personal knowledge and upon my review of official records of the United States Department of the Navy ("Navy") concerning this matter. I am at least eighteen years of age and am competent to testify to the matters contained herein.

2. I am employed by the Department of the Navy, in the Naval Facilities Engineering Systems Command, Base Realignment and Closure ("BRAC") Program Management Office. I am currently the Base Closure Manager with responsibility for the former Hunters Point Naval Shipyard ("Hunters Point" or "the Site") at issue in the above captioned matter. I have served in this role since April 2023. My duties include leadership, management, and coordination of response actions at Hunters Point, including the environmental cleanup

program and real estate transfer actions. I also served in other roles at the Site. I was Business Line Team Leader between December 2018 and February 2023. My duties in this role included oversight of the Environmental Restoration Program at several sites, including Hunters Point. Before that, I was the Lead Remedial Project Manager between November 2015 and December 2018. My duties in this role included executing the Environmental Restoration Program for Hunters Point.

3. I hold a Bachelor of Science degree in Chemical Engineering from the University of California, Los Angles, and Master of Science Degree in Environmental Engineering from San Diego State University.

4. I am familiar with the process for investigating and cleaning up contaminated sites under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). I am specifically familiar with the CERCLA response actions at Hunters Point. I have personal knowledge of the response actions that have been conducted since I began working for the Navy with responsibilities at Hunters Point. Part of my responsibilities as Base Closure Manager is to have general knowledge of the entire response action history at Hunters Point through review of relevant documents.

5. In the paragraphs below, I will provide a brief summary of (1) the base-wide CERCLA radiological removal action at Hunters Point, (2) the development of work plans to reinvestigate radiological contamination in areas where Tetra Tech did fraudulent surveying and reporting, and (3) implementation and current status of work being conducted under the work plans. As part of my responsibilities as Base Closure Manager, I have personal knowledge of these topics and knowledge gained through review of relevant documents.

## THE RADIOLOGICAL REMOVAL ACTION

6. The Navy has been performing response actions at Hunters Point since 1984. Hunters Point has been divided, and then subdivided, into the following 14 parcels to conduct response actions: A-1, A-2, B-1, B-2, C, D-1, D-2, E, E-2, F, G, UC-1, UC-2 and UC-3. The diagram in paragraph 61 of Plaintiff's first amended complaint accurately depicts the parcels at Hunters Point.

7. Radionuclides are one of the contaminants of concern at Hunters Point. In 2006, the Navy selected a base-wide removal action to remediate radiological contamination ("Radiological Removal Action"). The removal action selected is documented in the Final Basewide Radiological Removal Action Memorandum, Revision 2006, Hunters Point Shipyard, San Franciso, California, dated April 21, 2006 ("2006 Removal Action Memo"), an excerpt of which is included at Exhibit 1 to this declaration. The removal action selected involves surveying radiological contamination, excavation and disposal of soils, and decontamination or demolition of structures, among other actions. 2006 Removal Action Memo, Ex. 1 at 20-21, 25.[1]

8. Work to implement the base-wide radiological removal action is ongoing. Storm and sanitary sewer lines were removed across most of the site; approximately eight miles remain for removal. The work plan for the storm and sanitary sewer lines left for removal is currently in progress. The Navy is currently conducting rework at sites where Tetra Tech performed activities to implement the Radiological Removal Action, both for radiologically-impacted soils and buildings.

---

[1] The page numbers cited are the PDF page numbers from each exhibit.

## THE NAVY'S RETESTING WORK PLANS

9. The Navy contracted with Tetra Tech to perform work to implement the Radiological Removal Action. From 2003 to 2014, Tetra Tech conducted radiological surveys and removed contaminated soil and structures from parcels B-1, B-2, C, D-2, E, G, UC-1, UC-2, and UC-3 at Hunters Point. In October 2012, the Navy discovered discrepancies in Tetra Tech's soil sampling. Navy investigations and EPA review identified evidence of potential data manipulation or falsification for soil sampling and building surveys.

10. The Navy developed Removal Site Evaluation Work Plans ("Work Plans") to reinvestigate and cleanup any radiological contamination at parcels B, C, and G.[2] Excerpts from the final Work Plans for parcels B, C, and G are attached as Exhibits 2, 3, and 4. Under the Work Plans, there are two phases of retesting for areas that contained sanitary sewers and storm drain trenches. In Phase 1, the Navy will excavate and characterize 100% of the soil in one-third of the trenches at the parcels. *See* Parcel B Work Plan, Ex. 2 at 9; Parcel C Work Plan, Ex. 3 at 7; Parcel G Work Plan, Ex. 4 at 6. The trenches selected in Phase 1 are those with the highest potential for contamination. *Id.* In Phase 2, the Navy will conduct soil sampling in at least 18 boring locations within each trench boundary with one boring every 50 linear feet along the side walls of the trench. *Id.* The Navy also will complete radiological surveys in surface areas formerly surveyed by Tetra Tech and the Navy will resurvey buildings that Tetra Tech surveyed. *Id.* The Navy will excavate and characterize 100% of remaining trench locations in Phase 2 if any Phase 1 testing results are higher than radiological remedial goals and cannot be attributed to

---

[2] The Navy also produced workplans for parcels E, D-2, UC-1, UC-2 and UC-3. I am not addressing these workplans in this declaration because I understand that Plaintiff's claims regarding violations of retesting workplans are only for parcels B, C, and G.

background levels. *Id.* Under the Work Plans, the Navy is retesting for radioisotopes of concern identified in each parcel's Record of Decision. The exact radioisotopes depend on the history of each survey area. The Work Plans do not include deadlines for completion.

## THE NAVY'S ONGOING RETESTING UNDER THE WORK PLANS

11. The Navy's extensive excavation, sampling, and scanning activities under the Work Plans are ongoing for parcels B, C, and G. Parcels B and C are in Phase 1; parcel G is in Phase 2. The Navy intends to do 100% excavation and characterization in Phase 2 retesting for parcels B and C based on the discovery of two small radiologically impacted objects: a glass shard at parcel B and a deck marker at parcel C. The Navy is currently performing Phase 2 surface scans and spot testing in borings in parcel G because Phase 1 retesting did not result in exceedances of remedial goals using the Eichrom Method for Total Beta Strontium for retesting. As discussed below, the Navy used the Eichrom Method because the Navy determined that it is the most reliable testing method under the circumstances, and EPA concurred with the Navy's conclusion.

12. In 2020, the Navy began collecting and testing soil samples at parcel G under Phase 1 of the Work Plan. The Navy initially used Method 905 to test for strontium-90 as specified in the Work Plan, which returned some results above remedial goals for strontium-90. However, the Navy determined that the results were anomalous, could not be reproduced, and indicated false positive results.

13. To ensure that it was using the appropriate sampling method for strontium-90, the Navy reanalyzed over 1,000 samples using various methods, including Method 905, Method 905 Total Beta Strontium, the Eichrom Method, and the Eichrom Method for Total Beta Strontium. The Navy determined that Method 905 and Method 905 Total Beta Strontium showed a high

Declaration of Danielle Janda in Support of Motion to Dismiss
Case No. 3:24-cv-3899-VC                                                                                           5

probability of false positive results and did not produce reliable and reproducible data at the low concentrations of strontium-90 that were being reported at parcel G. The Navy also found that the Eichrom Method was not reliable because interference with Pb-210 was affecting the results. The Navy determined that the results using the Eichrom Method Total Beta Strontium were reliable. No results exceeded remedial goals using this method.

14. The Navy worked with EPA to confirm whether the Eichrom Method Total Beta Strontium results were, in fact, reliable and the results using the other methods were not. To do so, EPA proposed a method verification study that the Navy followed. The verification study results showed that Eichrom Method Total Beta Strontium was the most accurate, precise, and reproducible sampling method for low concentrations of strontium-90. These results are documented in the Navy's Final Technical Memorandum on Strontium Analysis, excerpts of which are attached as Exhibit 5. EPA approved the Navy's verification study, which is attached as Exhibit 6.

15. The Navy currently is conducting spot testing and surface scans in parcel G described above. The Phase 2 retesting decision will not be final until spot testing and surface scanning are complete. Under the Work Plan, the Navy will perform excavation and retesting during Phase 2 in any trenches where Phase 2 spot testing and radiological surface scan results exceed radiological remedial goals and are not attributable to background. *See* Parcel G Work Plan, Ex. 4 at 9.

Executed on October 31, 2024, in San Diego, CA.

BY: JANDA.DANIELLE.L.1381192438
Digitally signed by JANDA.DANIELLE.L.1381192438
Date: 2024.10.31 14:12:49 -07'00'

Danielle Janda, M.S.
Base Closure Manager