

Naval Facilities Engineering Systems Command Southwest
BRAC PMO West, San Diego, California

**Final**

**Fifth Five-Year Review Report**

Hunters Point Naval Shipyard
San Francisco, California

July 2024

Distribution Statement A: Approved for public release: distribution is unlimited.



Naval Facilities Engineering Systems Command Southwest
BRAC PMO West, San Diego, California

**Final**

**Fifth Five-Year Review Report**

Hunters Point Naval Shipyard
San Francisco, California

July 2024

DCN: CH2M-0007-4930-0008

**Prepared for:**

Department of the Navy
Naval Facilities Engineering Systems Command Southwest
BRAC PMO West
33000 Nixie Way, Bldg. 50, Suite 207
San Diego, California 92147

**Prepared by:**



CH2M HILL, Inc.
San Diego, California

Contract Number: N62470-21-D-0007; Contract Task Order No. N6247322F4930

# Fifth Five-Year Review Report

### Hunters Point Naval Shipyard,
### San Francisco, California

### July 2024

This report documents the Fifth Five-Year Review for the Hunters Point Naval Shipyard that includes Installation Restoration (IR) Sites 7 and 18, and Parcels B-1, B-2, C, D-1, D-2, E, E-2, G, UC-1, UC-2, and UC-3 as required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) in accordance with CERCLA § 121(c), as amended, and the National Oil and Hazardous Substances Pollution Contingency Plan, Part 300.430(f)(4)(ii) of the Code of Federal Regulations.

Approved by:

POUND.MICHAEL.J.

Digitally signed by
POUND.MICHAEL.J.
Date: 2024.07.30 13:07:07 -07'00'

7/30/2024

Michael Pound                                                                 Date
Base Realignment and Closure Program
Environmental Coordinator

CH2M-0007-4930-0008

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

SIGNATURE PAGE

This page intentionally left blank.

CH2M-0007-4930-0008

# Contents

Acronyms and Abbreviations ................................................................................................ xi

Executive Summary .......................................................................................................... xv

Five-Year Review Summary Form ...................................................................................... xvii

1.0  Introduction ............................................................................................................ 1-1
    1.1  Purpose and Approach .................................................................................. 1-1
    1.2  Environmental Restoration Program ............................................................. 1-2
    1.3  Installation Background and Setting .............................................................. 1-3
        1.3.1  Location and Physical Setting ............................................................ 1-3
        1.3.2  Topography ....................................................................................... 1-3
        1.3.3  Geology and Hydrogeology ............................................................... 1-3
        1.3.4  Land and Resource Use .................................................................... 1-4
    1.4  Basewide Considerations Relevant to the Five-Year Review Process ............ 1-7
        1.4.1  Per- and Polyfluoroalkyl Substances ................................................. 1-7
        1.4.2  Climate Resilience Assessment ........................................................ 1-8
        1.4.3  Radiological Retesting and Remediation Goal Evaluation ................... 1-9
        1.4.4  Air Monitoring and Dust Control ...................................................... 1-10
    1.5  Report Organization .................................................................................. 1-11
    1.6  References ................................................................................................ 1-11

2.0  Five-Year Review Process ...................................................................................... 2-1
    2.1  Site Interviews ............................................................................................. 2-1
    2.2  Site Inspections ........................................................................................... 2-1
    2.3  Document and Data Review .......................................................................... 2-1
    2.4  Technical Assessment .................................................................................. 2-1
    2.5  Community Notification and Involvement ....................................................... 2-2
    2.6  Next Five-Year Review ................................................................................. 2-3
    2.7  References ................................................................................................... 2-3

3.0  Former Parcel B (Installation Restoration Sites 07 and 18, Parcels B-1 and B-2) .. 3-1
    3.1  Site History and Background .......................................................................... 3-1
    3.2  Site Characterization .................................................................................... 3-3
        3.2.1  Physical Characteristics .................................................................... 3-3
        3.2.2  Land Use .......................................................................................... 3-4
        3.2.3  Basis for Taking Action ..................................................................... 3-4
    3.3  Remedial Action Objectives ......................................................................... 3-5
    3.4  Remedial Actions ......................................................................................... 3-5
        3.4.1  IR-07/18 ............................................................................................ 3-5
        3.4.2  Parcel B-1 ........................................................................................ 3-9
        3.4.3  Parcel B-2 ....................................................................................... 3-12
        3.4.4  Progress Since the Fourth Five-Year Review ................................... 3-17
    3.5  Technical Assessment ................................................................................ 3-17
        3.5.1  Question A: Is the Remedy Functioning as Intended by the
                Decision Document? ...................................................................... 3-17
        3.5.2  Question B: Are the Exposure Assumptions, Toxicity Data,
                Cleanup Levels, and Remedial Action Objectives Used at the
                Time of the Remedy Selection Still Valid? .................................... 3-19

3.5.3 Question C: Has Any Other Information Come to Light that Could Question the Protectiveness of the Remedy? ............................. 3-22
3.6 Issues, Recommendations, and Follow-up Actions ........................... 3-23
3.6.1 Other Findings ............................................................... 3-23
3.7 Statement of Protectiveness .......................................................... 3-24
3.7.1 IR-07/18 .......................................................................... 3-24
3.7.2 Parcel B-1 ....................................................................... 3-24
3.7.3 Parcel B-2 ....................................................................... 3-24
3.8 References ....................................................................................... 3-25

4.0 Former Parcel C (Parcels C and UC-2) ........................................... 4-1
4.1 Site History and Background ............................................................ 4-1
4.2 Site Characterization ........................................................................ 4-2
4.2.1 Physical Characteristics ................................................. 4-2
4.2.2 Land Use ........................................................................... 4-4
4.2.3 Basis for Taking Action ................................................... 4-4
4.3 Remedial Action Objectives ............................................................. 4-5
4.4 Remedial Actions ............................................................................... 4-6
4.4.1 Parcel C ............................................................................. 4-6
4.4.2 Parcel UC-2 ..................................................................... 4-15
4.4.3 Progress Since the Fourth Five-Year Review ............... 4-17
4.5 Technical Assessment ...................................................................... 4-17
4.5.1 Question A: Is the Remedy Functioning as Intended by the Decision Document? .................................................... 4-17
4.5.2 Question B: Are the Exposure Assumptions, Toxicity Data, Cleanup Levels, and Remedial Action Objectives Used at the Time of the Remedy Selection Still Valid? ................ 4-18
4.5.3 Question C: Has Any Other Information Come to Light that Could Question the Protectiveness of the Remedy? ...... 4-20
4.6 Issues, Recommendations, and Follow-up Actions ........................ 4-21
4.6.1 Other Findings ............................................................... 4-21
4.7 Statement of Protectiveness .......................................................... 4-22
4.7.1 Parcel C ........................................................................... 4-22
4.7.2 Parcel UC-2 ..................................................................... 4-22
4.8 References ....................................................................................... 4-23

5.0 Former Parcel D (Parcels D-1, D-2, UC-1, and G) ........................ 5-1
5.1 Site History and Background ............................................................ 5-1
5.2 Site Characterization ........................................................................ 5-2
5.2.1 Physical Characteristics ................................................. 5-2
5.2.2 Land Use ........................................................................... 5-3
5.2.3 Basis for Taking Action ................................................... 5-4
5.3 Remedial Action Objectives ............................................................. 5-5
5.4 Remedial Actions ............................................................................... 5-5
5.4.1 Parcel D-1 ......................................................................... 5-5
5.4.2 Parcel UC-1 ....................................................................... 5-9
5.4.3 Parcel D-2 ....................................................................... 5-10
5.4.4 Parcel G ........................................................................... 5-10
5.4.5 Progress Since the Fourth Five-Year Review ............... 5-13

CH2M-0007-4930-0008

| | | | |
|---|---|---|---|
| 5.5 | | Technical Assessment | 5-13 |
| | 5.5.1 | Question A: Is the Remedy Functioning as Intended by the Decision Document? | 5-13 |
| | 5.5.2 | Question B: Are the Exposure Assumptions, Toxicity Data, Cleanup Levels, and Remedial Action Objectives Used at the Time of the Remedy Selection Still Valid? | 5-14 |
| | 5.5.3 | Question C: Has Any Other Information Come to Light that Could Question the Protectiveness of the Remedy? | 5-17 |
| 5.6 | | Issues, Recommendations, and Follow-up Actions | 5-17 |
| | 5.6.1 | Other Findings | 5-17 |
| 5.7 | | Statement of Protectiveness | 5-18 |
| | 5.7.1 | Parcel D-1 | 5-18 |
| | 5.7.2 | Parcel D-2 | 5-19 |
| | 5.7.3 | Parcel UC-1 | 5-19 |
| | 5.7.4 | Parcel G | 5-19 |
| 5.8 | | References | 5-19 |
| **6.0** | | **Former Parcel E (Parcels E, E-2, and UC-3)** | **6-1** |
| 6.1 | | Site History and Background | 6-1 |
| 6.2 | | Site Characterization | 6-3 |
| | 6.2.1 | Physical Characteristics | 6-3 |
| | 6.2.2 | Land Use | 6-5 |
| | 6.2.3 | Basis for Taking Action | 6-5 |
| 6.3 | | Remedial Action Objectives | 6-7 |
| 6.4 | | Remedial Actions | 6-7 |
| | 6.4.1 | Parcel E | 6-7 |
| | 6.4.2 | Parcel E-2 | 6-12 |
| | 6.4.3 | Parcel UC-3 | 6-17 |
| | 6.4.4 | Progress Since the Fourth Five-Year Review | 6-19 |
| 6.5 | | Technical Assessment | 6-19 |
| | 6.5.1 | Question A: Is the Remedy Functioning as Intended by the Decision Document? | 6-19 |
| | 6.5.2 | Question B: Are the Exposure Assumptions, Toxicity Data, Cleanup Levels, and Remedial Action Objectives Used at the Time of the Remedy Selection Still Valid? | 6-21 |
| | 6.5.3 | Question C: Has Any Other Information Come to Light that Could Question the Protectiveness of the Remedy? | 6-23 |
| 6.6 | | Issues, Recommendations, and Follow-up Actions | 6-24 |
| | 6.6.1 | Other Findings | 6-24 |
| 6.7 | | Statement of Protectiveness | 6-26 |
| | 6.7.1 | Parcel E | 6-26 |
| | 6.7.2 | Parcel E-2 | 6-26 |
| | 6.7.3 | Parcel UC-3 | 6-27 |
| 6.8 | | References | 6-27 |

CH2M-0007-4930-0008

## Appendixes

A    Climate Resilience Assessment ................................................................... 1
B    Interview Summaries .................................................................................... 1
C    Site Inspection and Photograph Logs .......................................................... 1
D    Public Notice ................................................................................................. 1
E    Groundwater Monitoring Summary (DCNs: TRBW-0202-4996-0013;
     TRBW-0202-4996-0018;  TRBW-0202-4996-0022) ..................................... 1
F    Radiological Review ..................................................................................... 1
G    A-Aquifer Groundwater Figures from Site Inspection for Basewide Investigation of
     PFAS (DCN: LBJV-5006-4496-0034) ........................................................... 1
H    Parcel E-2 Landfill Extraction Well Letter and Landfill Gas Monitoring Probe
     Technical Memorandum  (DCNs: ERRG-6011-0000-0036; GESL-0005-5163-0022) ........ 1
I    Comments and Responses to Regulatory Agency Comments on Draft Fifth Five-Year
     Review Report and Climate Resilience Assessment ..................................... 1
J    Comments and Responses to City of San Francisco Department of Health
     Comments on Draft Five-Year Review Report and Climate Resilience Assessment ........ 1
K    Responses to Public Comments on Draft Five-Year Review Report and
     Climate Resilience Assessment ................................................................... 1

## Tables

1-1    Summary of Hunters Point Naval Shipyard Parcels for Five-Year Review ................. 1-15
1-2    Installation Restoration Site Summary ......................................................... 1-21
1-3    Institutional Controls Summary ................................................................... 1-29
1-4    Air Monitoring Summary ............................................................................. 1-31
3-1    Parcel B Chemicals of Concern and Remediation Goals ............................... 3-31
3-2    Parcel B Remediation Goals for Radionuclides ........................................... 3-35
3-3    Parcel B Remedial Action Summary and Expected Outcomes ...................... 3-37
3-4    Comparison of Groundwater and Surface Water Quality Parameters............ 3-41
3-5    Fourth Five-Year Review Parcel B Issues, Recommendations, and Follow-up
       Actions ................................................................................................... 3-43
3-6    Parcel B Chemicals of Concern and Current Comparison Criteria for Groundwater ..... 3-45
3-7    Parcel B Chemicals of Concern for Ecological Receptors – Sediment ......... 3-47
3-8    Parcel B Chemicals of Potential Concern for Ecological Receptors – Groundwater ..... 3-49
3-9    Parcel B Issues, Recommendations, and Follow-up Actions ........................ 3-51
4-1    Parcel C and UC-2 Chemicals of Concern and Remediation Goals .............. 4-27
4-2    Parcels C and UC-2 Remediation Goals for Radionuclides ......................... 4-33
4-3    Parcel C Remedial Action Summary and Expected Outcomes ..................... 4-35
4-4    Parcel UC-2 Remedial Action Summary and Expected Outcomes ............... 4-37
4-5    Fourth Five-Year Review Parcel C and UC-2 Issues, Recommendations, and
       Follow-up Actions .................................................................................... 4-39
4-6    Parcels C and UC-2 Chemicals of Concern and Current Comparison Criteria for
       Groundwater ............................................................................................ 4-41
4-7    Parcel C Chemicals of Potential Concern for Ecological Receptors – Groundwater ..... 4-47
4-8    Parcel C and UC-2 Issues, Recommendations, and Follow-up Actions ........ 4-49
5-1    Parcels D-1, G, and UC-1 Chemicals of Concern and Remediation Goals .......... 5-23
5-2    Parcels D-1, G, and UC-1 Remediation Goals for Radionuclides ................ 5-25
5-3    Parcel D-1 and UC-1 Remedial Action Summary and Expected Outcomes ......... 5-27

CH2M-0007-4930-0008

5-4    Parcel G Remedial Action Summary and Expected Outcomes.....................................5-29
5-5    Fourth Five-Year Review Parcels D-1, D-2, UC-1, and G Issues, Recommendations, and Follow-up Actions.....................................5-31
5-6    Parcels D-1, G, and UC-1 Chemicals of Concern and Current Comparison Criteria for Groundwater.....................................5-33
5-7    Parcels D-1, UC-1, and G Chemicals of Potential Concern for Ecological Receptors – Groundwater.....................................5-35
5-8    Parcels D-1, D-2, UC-1, and G Issues, Recommendations, and Follow-up Actions.....5-37
6-1    Parcels E and UC-3 Chemicals of Concern and Remediation Goals.....................................6-31
6-2    Parcel E-2 Chemicals of Concern and Remediation Goals.....................................6-35
6-3    Parcels E and E-2 Remediation Goals for Radionuclides.....................................6-39
6-4    Parcel E Remedial Action Summary and Expected Outcomes.....................................6-41
6-5    Parcel E-2 Remedial Action Summary and Expected Outcomes.....................................6-45
6-6    Parcel UC-3 Remedial Action Summary and Expected Outcomes.....................................6-49
6-7    Fourth Five-Year Review Parcel E Issues, Recommendations, and Follow-up Actions.....................................6-51
6-8    Parcel E Chemicals of Concern and Current Comparison Criteria for Domestic Use of Groundwater.....................................6-53
6-9    Parcel E-2 Chemicals of Concern and Current Comparison Criteria for Domestic Use of Groundwater.....................................6-55
6-10   Parcel UC-3 Chemicals of Concern and Current Comparison Criteria for Groundwater.....................................6-57
6-11   Parcel UC-3 Issues, Recommendations, and Follow-up Actions.....................................6-59

**Figures**

1-1    Base Overview Figure/Parcel Map.....................................1-33
1-2    Installation Restoration Sites.....................................1-35
1-3    Land Use Districts.....................................1-37
1-4    Institutional Controls.....................................1-39
1-5    Basewide Radiological Time-Critical Removal Action Survey Trenches.....................................1-41
3-1    Parcel B (Installation Restoration Sites 07 and 18, Parcels B-1 and B-2).....................................3-53
3-2    Parcel B (Installation Restoration Sites 07 and 18, Parcels B-1 and B-2) Institutional Controls.....................................3-55
3-3    Overview of Remedy Components for IR-07/18.....................................3-57
3-4    Overview of Remedy Components for Parcel B-1.....................................3-59
3-5    March and September 2022 Exceedances of Remediation Goals in Parcels B-1, B-2, and IR-07/18.....................................3-61
3-6    Overview of Remedy Components for Parcel B-2.....................................3-63
3-7    Time-series Plots for Mercury in IR-26 Groundwater.....................................3-65
4-1    Parcel C (Parcels C and UC-2).....................................4-51
4-2    Parcel C (Parcels C and UC-2) Institutional Controls.....................................4-53
4-3    Overview of Remedy Components for Parcel C.....................................4-55
4-4    March and September 2022 Exceedances of Remediation Goals in Parcel C Remedial Units C-1.....................................4-57
4-5    March and September 2022 Exceedances of Remediation Goals in Parcel C Remedial Unit C-2.....................................4-59
4-6    March and September 2022 Exceedances of Remediation Goals in Parcel C Remedial Units C-4.....................................4-61

4-7     March and September 2022 Exceedances of Remediation Goals in Parcel C
        Remedial Unit C-5 and Parcel UC-2 ................................................................4-63
4-8     Overview of Remedy Components for Parcel UC-2 .....................................4-65
5-1     Parcel D (Parcels D-1, D-2, G, and UC-1) ..................................................5-39
5-2     Parcel D (Parcels D-1, D-2, UC-1, and G) Institutional Controls ................5-41
5-3     Overview of Remedy Components for Parcel D-1 .........................................5-43
5-4     Overview of Remedy Components for Parcel UC-1 .......................................5-45
5-5     Overview of Remedy Components for Parcel G ............................................5-47
6-1     Parcel E (Parcels E, E-2, and UC-3) ...........................................................6-61
6-2     Parcel E (Parcels E, E-2, and UC-3) Institutional Controls .........................6-63
6-3     Overview of Remedy Components for Parcel E .............................................6-65
6-4     Overview of Remedy Components for Parcel E-2 ..........................................6-67
6-5     Overview of Remedy Components for Parcel UC-3 .......................................6-69

CH2M-0007-4930-0008

# Acronyms and Abbreviations

| | |
|---|---|
| μg/L | microgram(s) per liter |
| AFFF | aqueous film-forming foam |
| Am-241 | americium-241 |
| AOMSR | Annual Operation and Maintenance Summary Report |
| ARAR | applicable or relevant and appropriate requirement |
| ARIC | area requiring institutional controls |
| ATC | active treatment criterion |
| BCT | BRAC Cleanup Team |
| BCY | bank cubic yard(s) |
| BERA | Baseline Ecological Risk Assessment |
| BGMP | Basewide Groundwater Monitoring Program |
| bgs | below ground surface |
| BRAC | Base Realignment and Closure |
| BTAG | Biological Technical Assistance Group |
| CDPH | California Department of Public Health |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| cis-1,2-DCE | cis-1,2-dichloroethene |
| cm$^2$ | square centimeter(s) |
| Co-60 | cobalt-60 |
| COC | chemical of concern |
| COEC | chemical of ecological concern |
| COPC | chemical of potential concern |
| Cs-137 | cesium-137 |
| CVOC | chlorinated volatile organic compound |
| 1,2-DCE | 1,2-dichloroethene |
| DBR | Design Basis Report |
| DTSC | California Department of Toxic Substances Control |
| EcoSSL | ecological soil screening level |
| ERA | ecological risk assessment |
| ERM | effects range median |
| ESD | Explanation of Significant Differences |
| F-WBZ | fractured water-bearing zone |

CH2M-0007-4930-0008

| FFA | Federal Facilities Agreement |
|---|---|
| FS | Feasibility Study |
| FSS | final status survey |
| GCCS | gas control and collection system |
| HGAL | Hunters Point groundwater ambient level |
| HHRA | human health risk assessment |
| HPNS | Hunters Point Naval Shipyard |
| HRA | Historical Radiological Assessment |
| IC | institutional control |
| IR | Installation Restoration |
| IRIS | Integrated Risk Information System |
| ISB | in situ biodegradation |
| ISS | in situ stabilization |
| K-40 | potassium-40 |
| LLRW | low-level radioactive waste |
| LNAPL | light nonaqueous phase liquid |
| LTM | long-term monitoring |
| LUC | land use control |
| MARSSIM | Multi-Agency Radiation Survey and Site Investigation Manual |
| MCL | maximum contaminant level |
| MLLW | mean lower low water |
| MNA | monitored natural attenuation |
| MNR | monitored natural recovery |
| msl | mean sea level |
| NAPL | nonaqueous phase liquid |
| NAVFAC | Naval Facilities Engineering Systems Command |
| Navy | Department of the Navy |
| NMOC | non-methane organic compound |
| NPL | National Priorities List |
| NRDL | Naval Radiological Defense Laboratory |
| NRWQC | National Recommended Water Quality Criteria |
| O&M | operations and maintenance |
| OCII | Office of Community Investment and Infrastructure |
| PA | preliminary assessment |

CH2M-0007-4930-0008

| | |
|---|---|
| PAH | polycyclic aromatic hydrocarbon |
| PAL | project action limit |
| PCB | polychlorinated biphenyl |
| PCE | tetrachloroethene |
| PFAS | per- and polyfluoroalkyl substances |
| PFBS | perfluorobutane sulfonate |
| PFHxS | perfluorohexanesulfonic acid |
| PFNA | perfluorononanoic acid |
| PFOA | perfluorooctanoic acid |
| PFOS | perfluorooctane sulfonate |
| PMO | Program Management Office |
| PPRTV | Provisional Peer-reviewed Toxicity Values |
| PQL | practical quantitation limit |
| PRG | Preliminary Remediation Goal |
| Pu-239 | plutonium-239 |
| RA | remedial action |
| Ra-226 | radium-226 |
| RACR | Remedial Action Completion Report |
| RAMP | Remedial Action Monitoring Plan |
| RAMR | Remedial Action Monitoring Report |
| RAO | remedial action objective |
| RAWP | Remedial Action Work Plan |
| RD | remedial design |
| Regional Water Board | California Regional Water Quality Control Board, San Francisco Bay Region |
| RG | remediation goal |
| RI | Remedial Investigation |
| RMP | Risk Management Plan |
| RO | radiological object |
| ROC | radionuclide of concern |
| ROD | Record of Decision |
| RSL | Regional Screening Level |
| RSRS | Radiological Survey and Remedial Services |
| RU | remedial unit |

| | |
|---|---|
| SGAL | soil gas action level |
| SI | site inspection |
| SL | screening level |
| SLERA | screening-level ecological risk assessment |
| SLR | sea level rise |
| Sr-90 | strontium-90 |
| SVE | soil vapor extraction |
| SVOC | semivolatile organic compound |
| SWRCB | State Water Resources Control Board |
| TCE | trichloroethene |
| TCR | Toxicity Criteria Rule |
| TCRA | time-critical removal action |
| Th-232 | thorium-232 |
| TL | trigger level |
| TPH | total petroleum hydrocarbons |
| Triple A | Triple A Machine Shop, Inc. |
| TRV | toxicity reference value |
| U-235 | uranium-235 |
| UCL | upper confidence limit |
| UCSF | University of California San Francisco |
| USEPA | United States Environmental Protection Agency |
| UU/UE | unlimited use and unrestricted exposure |
| VC | vinyl chloride |
| VISL | vapor intrusion screening level |
| VOC | volatile organic compound |
| ZVI | zero-valent iron |

# Executive Summary

The Department of the Navy conducted this Five-Year Review for Hunters Point Naval Shipyard (HPNS) in San Francisco, California, as required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). The Five-Year Review was conducted in accordance with CERCLA §121I, as amended by the Superfund Amendments and Reauthorization Act, and the National Oil and Hazardous Substances Pollution Contingency Plan, Part 300.430(f)(4)(ii) of the Code of Federal Regulations. In addition, the Five-Year Review was conducted in accordance with the following documents:

- *Comprehensive Five-Year Review Guidance* (USEPA, 2001) and supplements (USEPA, 2012a, 2012b, 2016)

- *Navy/Marine Corps Policy for Conducting Comprehensive Environmental Response, Compensation, and Liability Act Five-Year Reviews* (Navy, 2011b)

- *Toolkit for Preparing Five-Year Reviews* (NAVFAC, 2013)

- *Defense Environmental Restoration Program (DERP) Management Manual Number 4715.20* (DoD, 2018)

- *Department of the Navy Environmental Restoration Program Manual* (Navy, 2018b)

This report summarizes the evaluation of remedies that resulted in hazardous substances, pollutants, or contaminants remaining at sites above levels that allow for unlimited use and unrestricted exposure (UU/UE), and for which there is a final Record of Decision (ROD). A ROD requiring a Five-Year Review has been finalized for the following HPNS parcels and sites:

- Former Parcel B (composed of Installation Restoration [IR] Sites 7 and 18 [IR-07/18] and Parcels B-1 and B-2)

- Former Parcel C (composed of Parcels C and UC-2)

- Former Parcel D (composed of Parcels D-1, D-2, UC-1, and G)

- Former Parcel E (composed of Parcels E, E-2, and UC-3)

This is the Fifth Five-Year Review at HPNS. The objective of this Five-Year Review is to evaluate the selected remedies at these sites and parcels and determine whether the remedies remain protective of human health and the environment in accordance with the requirements set forth in each of the RODs. The principal method used to evaluate the protectiveness of the remedies was a review of documents pertaining to site activities, analytical data, and findings. The methods, findings, and conclusions from the document reviews are presented in this Five-Year Review Report. This report is intended to identify issues that may prevent a particular remedy from functioning as designed, which could affect the protection of human health and the environment should exposure occur. In addition, this report presents a screening level Climate Resilience Assessment to address potential future effects of climate change on the selected remedies. The overall evaluations of the effectiveness of each remedy are presented as protectiveness statements in the Five-Year Review Summary Form provided on the following page. Based on this Fifth Five-Year Review, the remedy at IR-07/18 is Protective, the remedies at Parcels B-1, UC-2, D-1, D-2, UC-1, G, and UC-3 are Short-Term Protective because there are no current uncontrolled exposures, the remedies at Parcels E and E-2 will be protective upon completion of remedy construction, and protectiveness is deferred for Parcel B-2 because there is uncertainty related to the concentrations of mercury discharging to the bay from

Parcel B-2, IR-26 groundwater, and Parcel C because there is uncertainty related to the hydrogeologic communication between the A- and B-aquifers and whether discharge of chemicals present in the B-aquifer present potential unacceptable risks to bay receptors.

The Five-Year Review Summary Form, which provides a summary of issues, recommendations, and protectiveness statements for each site evaluated in this Five-Year Review, is provided herein. The period under review is December 1, 2018, to November 1, 2023.

CH2M-0007-4930-0008

# Five-Year Review Summary Form

| SITE IDENTIFICATION |
|---|
| **Site name:** Hunters Point Naval Shipyard |
| **USEPA ID:** CA1170090087 |

| Region: 9 | **State:** California | **City/County:** San Francisco/San Francisco |
|---|---|---|

| SITE STATUS |
|---|
| NPL status: Final |

| Multiple OUs?<br>Yes | Has the site achieved construction completion?<br>No |
|---|---|

| REVIEW STATUS |
|---|
| **Lead agency:** Other Federal Agency<br>If "Other Federal Agency" was selected above, enter Agency name: Department of the Navy |
| **Author name (Federal or State Project Manager):** Naval Facilities Engineering Systems Command (NAVFAC), Base Realignment and Closure (BRAC) Program Management Office (PMO) West |
| Review period [Time to complete the Five-Year Review]: October 1, 2022 – November 1, 2023 |
| **Date of site inspection:** February 9, 2023, January 23, 2024 |
| Type of review: Statutory |
| Review number: 5 |
| **Triggering action date:** 7/31/2019 (signature date of Fourth Five-Year Review) |
| Due date (5 years after triggering action date): 7/31/2024 |

The following pages summarize issues, recommendations, other findings, and protectiveness statements for each Five-Year Review site.

CH2M-0007-4930-0008

## ISSUES/RECOMMENDATIONS

**Sites without Issues/Recommendations Affecting Protectiveness Identified in the Five-Year Review:**

- IR-07/18
- Parcel E

- Parcel E-2

**Issues and Recommendations Identified in the Five-Year Review:**

| Site:<br>Parcels B-1, B-2, C, D-1, D-2, UC-1, UC-2, UC-3, G | Issue Category: Remedy Performance |
| | **Issue:** As identified in the Fourth Five-Year Review, there is uncertainty with a portion of the radiological survey and remediation work performed between 2004 and 2016 under the Basewide Radiological Removal Action, Action Memorandum (Navy, 2006). The Navy is in the process of implementing corrective actions to ensure the radiological remedies specified in the decision documents were implemented as intended; however, this work is ongoing. |
| | **Recommendation:** Complete radiological retesting at radiologically impacted sites, including current and former buildings and soil areas investigated under the Radiological Removal Action, Action Memorandum (Navy, 2006) and areas where evaluations determined previous data were unreliable. |

| Affect Current Protectiveness | Affect Future Protectiveness | Implementing Party | Oversight Party | Milestone Date |
|---|---|---|---|---|
| N | Y | Navy | USEPA | B-1 and B-2: 2/27/2025<br>C: 2/5/2025<br>D-1: 11/27/2026<br>D-2, UC-1, UC-2, UC-3: 3/2/2028<br>G: 10/2/2025 |

| Site:<br>Parcel B-2 | Issue Category: Remedy Performance |
| | **Issue:** The in-situ stabilization remedy for mercury in Parcel B-2, IR-26 groundwater did not reduce concentrations to below the 0.6 µg/L trigger level across the entire site and there is uncertainty related to the concentrations of mercury potentially discharging to the Bay from Parcel B-2, IR-26 groundwater. |
| | **Recommendation 1:** Prepare a primary document evaluating technologies for treating mercury in groundwater and presenting a proposed treatment method for FFA regulatory agency review. |
| | **Recommendation 2:** Apply the selected method that is within compliance of the selected remedy in the record of decision and initiate performance monitoring. |

| Affect Current Protectiveness | Affect Future Protectiveness | Implementing Party | Oversight Party | Milestone Date |
|---|---|---|---|---|
| Protectiveness Deferred | | Navy | USEPA | Milestone 1: 10/31/2024<br>Milestone 2: 7/15/2025 |

| Site:<br>Parcel C | Issue Category: Remedy Performance |
| | **Issue:** There have been detections of chemicals of concern (COCs) from A-aquifer groundwater within the B-aquifer and fractured water-bearing zone (F-WBZ) groundwater and the connection and communication between hydrogeologic units within Parcel C is not fully understood. Therefore, further characterization is required to demonstrate that remedies within the A-aquifer will be effective and not re-contaminated by COCs within the B-aquifer and deep F-WBZ and unacceptable discharges to the bay are not and will not occur. |

CH2M-0007-4930-0008

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

FIVE-YEAR REVIEW SUMMARY FORM

| ISSUES/RECOMMENDATIONS | | | | |
|---|---|---|---|---|
| | **Recommendation:** Complete investigations of the bay Mud/Sandy Lean Clay aquitard and extent of chemicals in the B-aquifer and F-WBZ and use current ecological risk assessment methods and criteria to assess potential impacts to bay receptors. Where warranted, additional actions or changes to the remedy will be recommended at the conclusion of these investigations. | | | |
| **Affect Current Protectiveness** | **Affect Future Protectiveness** | **Implementing Party** | **Oversight Party** | **Milestone Date** |
| Protectiveness Deferred | Navy | USEPA | 5/31/2027 <br><br> Interim Milestones: <br><br> Five-Year Review Addendum 7/31/2025 <br><br> Completion of F-WBZ investigation fieldwork 11/30/2025 <br><br> completion of F-WBZ investigation report 11/30/2026 | |

| | | | | |
|---|---|---|---|---|
| Site: <br> Parcel D-1 | Issue Category: Changed Site Conditions | | | |
| | **Issue:** Radiological objects (ROs) were identified during excavation and remediation of soil in areas that were not considered radiologically impacted. There is a high degree of confidence that discrete ROs were removed to a depth of 2 feet below ground surface (bgs). However, there is a potential for ROs to be present in material below 2 feet bgs where shoreline expansion has occurred since 1946. | | | |
| | **Recommendation:** Evaluate additional remedies to address the potential presence of ROs in material 2 feet bgs and prepare the appropriate post-ROD documentation. | | | |
| **Affect Current Protectiveness** | **Affect Future Protectiveness** | **Implementing Party** | **Oversight Party** | **Milestone Date** |
| N | Y | Navy | USEPA | 12/20/2024 |

| Other Findings |
|---|
| The following findings and recommendations were identified in this Five-Year Review. <br><br> **Climate Change** <br><br> The Navy recognizes climate change is occurring and based on a screening level Climate Resilience Assessment (CRA) (**Appendix A**), sea level rise (SLR) is the major variable of climate change that could affect the remedies at HPNS. <br><br> The CRA estimates that groundwater emergence may occur in Parcel D-1 by the year 2035 and in IR-07/18, Parcel B-1, B-2, C, D-1, E, and E-2 wetland areas by the year 2065. However, protectiveness is only affected when increased CERCLA risk attributable to climate hazards has been identified (groundwater is likely to emerge and land use is such that receptors could be exposed and a future unacceptable health or ecological risk has been identified (data collected, validated, and evaluated following CERCLA risk assessment processes resulting in unacceptable risk to receptors). Where the potential for increased vapor intrusion is identified in other CERCLA documents, areas requiring institutional controls (ARICs) for VOCs are present, groundwater is being monitored, and removal of VOCs is occurring either through monitored natural attenuation (MNA) or active remediation, thus reducing the potential for future vapor intrusion by reducing the source. Therefore, the potential for groundwater emergence does not affect the protectiveness determination in this Five-Year Review. <br><br> Based on the results of the CRA, the Navy will continue to monitor ongoing groundwater concentration and elevation data onsite through the Basewide Groundwater Monitoring Program (BGMP) and evaluate this data as |

CH2M-0007-4930-0008

| Other Findings |
|---|

it relates to the effectiveness of site remedies. The Navy will also regularly evaluate nearby tidal gauge data to verify SLR projections. Additional site-specific assessments are planned which will include verifying mapping projections and evaluating the 2100 timeframe. Parcel D-1 will be prioritized and is scheduled to be initiated in 2025. Additional studies are planned for remaining parcels and meeting with the Navy and Agencies is planned for November 2024 to discuss the scope and priority of these studies as well as preparation of an adaptation plan, or similar document, if the site-specific studies show that CERCLA-type human health or ecological risk attributable to climate change requires adaptive measures.

Key climate change milestones include the following:

- Scoping and Prioritization Meeting – 11/30/2024

- Initiation of Parcel D-1 Study – Spring 2025

**Per- and Polyfluoroalkyl Substances**

The Navy is in the process of investigating per- and polyfluoroalkyl substances (PFAS) from historical use of PFAS-containing materials. Potential exposure pathways are under control through existing remedy components (institutional controls and durable covers) and data indicate that there is likely no imminent CERCLA risk while PFAS are investigated under the CERCLA process. The following areas are under investigation for PFAS:

- Parcels B-1, B-2, C, D-1, G, E, and E-2: A-aquifer groundwater

- Parcel B-1: IR-10 (Battery and Metal Plating Shop)

- Parcel C: Building 215, Fire Station

- Parcel D-1: Poseidon Area (Buildings 377, 384, 385, and 387), IR-69 (Bilge Water Pump House), and IR-70 (Former drum and tank storage area)

- Parcel G: IR-09 (Pickling and Plating Yard)

Key PFAS investigation milestones include the following:

- Final Basewide Remedial Investigation (RI) Work Plan – 4/30/2025

- RI Fieldwork – Spring/Summer 2025

- Final Basewide RI Report – 8/31/2026

**Parcel-specific Other Findings**

**Parcel E-2 Remediation Goals**

The California maximum contaminant levels for 1,2,3-trichloropropane was promulgated after the Parcel E-2 ROD was finalized. The Navy intends to prepare post-ROD change documentation to reflect this change.

**Parcel E-2 Other Findings**

The remedy at Parcel E-2 is complex and involves multiple phases of field work to install. A number of facilities that are important to understanding groundwater flow and contaminant concentrations have been completed or are substantially completed (for example, Nearshore Slurry Wall and landfill cover). The following is a summary of the remaining Remedial Action (RA) work, interim studies, and key milestones planned before completing the Remedial Action Completion Report:

- Evaluate the effect of landfill cap and slurry walls on groundwater including flow, leachate attenuation, and potential impact to the San Francisco Bay, anticipated by after the approval of the Parcel E-2 Phase IV work plan by the FFA regulatory agencies, anticipated by Spring 2027.

- Collect confirmation soil samples for lead in the wetland areas following the excavation, anticipated by Summer 2027.

- Collect confirmation soil samples for polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), pesticides and metals for the soil stockpile area, anticipated by Summer 2026.

- Construct remaining components of the remedy including the permanent landfill gas system, freshwater and tidal wetlands, and groundwater monitoring network under the approved Final Work Plan (KEMRON, 2018):

- Landfill Gas System (Phase IVa) anticipated in 11/30/2026

- Wetlands (Phase IVb) anticipated in 11/30/2027

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

FIVE-YEAR REVIEW SUMMARY FORM

| Other Findings |
|---|
| • Modify the landfill gas monitoring program to include a monitoring probe (GMP54) outside of the recently expanded landfill cover as a new compliance point by revising the appropriate primary document(s). The primary document(s) needing revision and the proposed schedule for revision will be further discussed with the FFA Regulatory Parties not later than 9/30/2024.<br><br>• Document completion of the protective liner and final cover installation in the Phase III Remedial Action Construction Summary Report anticipated by 11/30/2024.<br><br>• Conduct a study to evaluate the performance of the upland slurry wall as documented in the Post-Remedial Action Performance Evaluation Work Plan to evaluate the performance of the Upland Slurry Wall. Approval of the Final Workplan is anticipated by 11/15/2024, fieldwork is anticipated to be completed in April 2025, Draft Report to Navy in October 2025 and the Final Post-Construction Remedial Action Performance Report is anticipated by March 2026. |

## PROTECTIVENESS STATEMENT(S)

Former Parcel B

| Site:<br>IR Site 7/18 | Protectiveness Determination:<br>Protective | Addendum Due Date (if applicable):<br>Not Applicable |
|---|---|---|

**Protectiveness Statement:** The remedy at IR-07/18 is protective of human health and the environment.

The Remedial Action Objectives (RAOs) for soil and soil gas have been met through excavation and removal of contaminated soil, durable covers, and institutional controls (ICs). Groundwater monitoring indicates that COCs and radionuclides of potential concern (ROPCs) are less than trigger levels (TLs) during the majority of sampling events.

| Site:<br>Parcel B-1 | Protectiveness Determination:<br>Short-term Protective | Addendum Due Date (if applicable):<br>Not Applicable |
|---|---|---|

**Protectiveness Statement:** The remedy at Parcel B-1 is currently protective of human health and the environment. To determine whether the remedy can be considered protective in the long term, the radiological retesting work and the excavation of volatile organic compound (VOC)-impacted soil will be completed.

The RAOs for soil are met through hotspot excavation and offsite disposal, durable covers, and ICs. Excavation of VOC-impacted soil will permanently remove the source of VOCs to soil gas and groundwater. Groundwater long-term monitoring (LTM) and MNA are ongoing. Exposure to groundwater is controlled through ICs.

Radiological retesting is ongoing to confirm that levels in soils and structures are protective of human health. Until retesting is complete, short-term protectiveness is met through Navy controls such as access to the parcel through fencing, locked gates, and ICs (restricting intrusive work and maintaining durable covers).

| Site:<br>Parcel B-2 | Protectiveness Determination:<br>Protectiveness Deferred | Addendum Due Date (if applicable):<br>7/31/2025 |
|---|---|---|

CH2M-0007-4930-0008

## PROTECTIVENESS STATEMENT(S)

**Protectiveness Statement:** A protectiveness determination cannot be made because there is uncertainty related to the concentrations of mercury discharging to the Bay from Parcel B-2, IR-26 groundwater. In order to make a protectiveness determination, the following actions needs to be made: (1) evaluate technologies for treating mercury in groundwater (2) apply the selected method that is within compliance of the selected remedy in the record of decision. A draft primary document presenting an evaluation of the technologies and the proposed treatment method will be provided to the FFA regulatory agencies for review by October 31, 2024. The Navy anticipates initiating field application of the selected treatment method by mid-July 2025. Contingencies will be discussed during development of the work plan and exercised as the need arises. The protectiveness determination will be re-evaluated in the Five-Year Review addendum based on information that becomes available after the completion of this FYR.

The RAOs for soil are met through durable covers and ICs. Groundwater LTM and MNA is ongoing. Exposure to groundwater is controlled through ICs. Radiological retesting is ongoing to confirm that levels in soil and structures are protective of human health.

| Former Parcel C | | |
|---|---|---|
| Site:<br>Parcel C | Protectiveness Determination:<br>Protectiveness Deferred | Addendum Due Date (if applicable):<br>7/31/2025 |

**Protectiveness Statement:** A protectiveness determination cannot be made because there is uncertainty related to the hydrogeologic communication between the A- and B-aquifers and whether discharge of chemicals present in the B-aquifer present potential unacceptable risks to Bay receptors. In order to make a protectiveness determination, the following action, at a minimum, needs to be made: (1) complete investigations of the (a) Bay Mud/Sandy Lean Clay aquitard, (b) extent of chemicals in the deep F-WBZ in RU-C4, and (c) extent of chemicals in the B-aquifer and F-WBZ in RU-C2 and (2) use current ecological risk assessment methods and criteria, as appropriate, to assess potential impacts to Bay receptors.

The estimated timeframe for each action is as follows:

- Complete investigations of the Bay Mud/Sandy Lean Clay aquitard, expected to occur by Fall 2026

- Complete investigation of the extent of chemicals in the deep F-WBZ in RU-C4 expected to occur by Fall 2026

- Complete investigation of the extent of chemicals in the B-aquifer and F-WBZ in RU-C2 expected to occur by Spring 2027

- Assess potential impacts to Bay receptors, expected to occur by Fall 2026

The FFA parties will have discussions, as appropriate, prior to scoping and developing primary documents, such as workplans, expected to occur in Fall 2025. The protectiveness determination will be re-evaluated in the Five-Year Review addendum based on information that becomes available after the completion of this FYR.

The RAOs for soil are met through hotspot excavation and disposal, durable covers, and ICs. Groundwater remediation is ongoing, and, once active treatment is complete, MNA will continue until COCs reach remediation goals (RGs). Until that time, ICs control exposure to groundwater. Radiological retesting is ongoing to confirm that levels in soil and structures are protective of human health.

| Site:<br>Parcel UC-2 | Protectiveness Determination:<br>Short-term Protective | Addendum Due Date (if applicable):<br>Not Applicable |
|---|---|---|

**Protectiveness Statement:** The remedy at Parcel UC-2 is currently protective of human health and the environment. In order to determine whether the remedy can be considered protective in the long term, the radiological retesting work will be completed.

The RAOs for soil are met through durable covers and ICs. Groundwater monitoring is ongoing. Radiological retesting is ongoing to confirm that levels in soil and structures are protective of human health. Until retesting is complete, short-term protectiveness is met through Navy controls such as access to the parcel through fencing, locked gates, and ICs (restricting intrusive work and maintaining durable covers).

CH2M-0007-4930-0008

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

FIVE-YEAR REVIEW SUMMARY FORM

| PROTECTIVENESS STATEMENT(S) |
|---|

**Former Parcel D**

| Site: | Protectiveness Determination: | Addendum Due Date (if applicable): |
|---|---|---|
| Parcel D-1 | Short-term Protective | Not Applicable |

**Protectiveness Statement:** The remedy at Parcel D-1 is currently protective of human health and the environment. In order to determine whether the remedy can be considered protective in the long term, the radiological retesting work will be completed, and additional actions implemented to address the potential presence of ROs in subsurface soil.

The RAOs for soil are met through soil hotspot excavation and offsite disposal, durable covers, and ICs. Groundwater monitoring is ongoing and COCs have been consistently below RGs and TLs. Radiological retesting is ongoing to confirm that levels in soil and existing structures are protective of human health and post-ROD documentation is being prepared to address ROs in subsurface soil. Until retesting is complete, short-term protectiveness is met through Navy controls such as access to the parcel through fencing, locked gates, and ICs (restricting intrusive work and maintaining durable covers).

| Site: | Protectiveness Determination: | Addendum Due Date (if applicable): |
|---|---|---|
| Parcel D-2 | Short-term Protective | Not Applicable |

**Protectiveness Statement:** The remedy at Parcel D-2 is currently protective of human health and the environment.

Parcel D-2 was acceptable for UU/UE upon completion of the radiological TCRA; however, in order to determine whether the parcel remains acceptable for UU/UE, the radiological retesting work will be completed. Until retesting is complete, exposure to radionuclides of concern in site media is being controlled through security features such as fencing, locked gates, and signage.

| Site: | Protectiveness Determination: | Addendum Due Date (if applicable): |
|---|---|---|
| Parcel UC-1 | Short-term Protective | Not Applicable |

**Protectiveness Statement:** The remedy at Parcel UC-1 is currently protective of human health and the environment. In order to determine whether the remedy can be considered protective in the long term, the radiological retesting work will be completed.

The RAOs for soil are met through durable covers and ICs. Radiological retesting is ongoing to confirm that levels in soil and existing structures are protective of human health. Until retesting is complete, short-term protectiveness is met through Navy controls such as access to the parcel through fencing, locked gates, and ICs (restricting intrusive work and maintaining durable covers).

| Site: | Protectiveness Determination: | Addendum Due Date (if applicable): |
|---|---|---|
| Parcel G | Short-term Protective | Not Applicable |

**Protectiveness Statement:** The remedy at Parcel G is currently protective of human health and the environment. In order to determine whether the remedy can be considered protective in the long term, the radiological retesting work will be completed.

The RAOs for soil are met through soil hotspot excavation and offsite disposal, durable covers, and ICs. Groundwater treatment is completed, and monitoring is ongoing. Radiological retesting is ongoing to confirm that levels in soil and existing structures are protective of human health. While retesting is ongoing, short-term protectiveness is met through Navy controls such as access to the parcel through fencing, locked gates, and ICs (restricting intrusive work and maintaining durable covers).

**Former Parcel E**

| Site: | Protectiveness Determination: | Addendum Due Date (if applicable): |
|---|---|---|
| Parcel E | Will be Protective | Not Applicable |

CH2M-0007-4930-0008

## PROTECTIVENESS STATEMENT(S)

**Protectiveness Statement:** The remedy at Parcel E Will Be Protective upon completion of remedy construction and completion of the radiological retesting.

In the interim, exposures to COCs in soil, sediment, and groundwater are being controlled during construction using temporary sheet piles, erosion control measures, security fencing to prevent unauthorized access, and ICs. The RAOs for soil will be met through excavation and offsite disposal, closure of fuel and steam lines, durable covers, and ICs. The RAOs for soil gas will be met through soil vapor extraction (SVE) or excavation to address VOCs, and ICs. The RAOs for shoreline sediment will be met through excavation and offsite disposal, durable cover installation, shoreline protection, and a sea wall. The RAOs for groundwater will be met through in situ groundwater treatment, installation of a belowground barrier, monitoring, and ICs. The RAOs for radiologically impacted media will be met through radiological surveys, decontamination, and removal of radiologically impacted structures, soil, and sediment, and ICs. The RAOs for NAPL will be met through removal and treatment of NAPL source, in situ stabilization, and containment.

Soil excavation to remove COC- and radiologically impacted soil has been completed. The following remedy components are under construction: installation of the shoreline armored revetment and the cement-bentonite slurry wall and belowground barrier, removal of sanitary sewer and storm drain lines, and excavation of NAPL followed by initiation of the in situ stabilization (ISS) treatment. Groundwater is currently being monitored through the BGMP.

| Site: | Protectiveness Determination: | Addendum Due Date (if applicable): |
|---|---|---|
| Parcel E-2 | Will be Protective | Not Applicable |

**Protectiveness Statement:** The remedy at Parcel E-2 Will Be Protective upon completion of remedy construction.

Soil and sediment hotspots have been removed and the final cover is currently under construction. Landfill gas venting and monitoring is ongoing during construction activities. Exposure to soil and groundwater is currently being controlled through security fencing to prevent unauthorized access, signage, and ICs. The RAOs for soil will be met through hotspot removal, soil cover and sea wall, and ICs.

The radiological RAOs will be met through radiological screening and removal, installation of a soil cover with demarcation layer, and ICs. The RAOs for landfill gas will be met through landfill gas monitoring, removal, and treatment, landfill cover monitoring, and ICs. The RAOs for groundwater will be met through LTM and ICs. The RAOs for surface water will be met through installation of the protective soil cover, slurry walls, diversion to tidal and non-tidal constructed wetlands, and outfall monitoring.

The following activities have been completed: soil excavation to remove COC- and low-level radiologically impacted soil, installation of soil layer of radiologically cleared soil and a soil cover, installation of the shoreline armored revetment, cement-bentonite slurry walls along the shoreline and in the upland portion of the parcel, and the installation of a portion of the landfill gas collection and treatment system. Groundwater is currently being monitored through the BGMP.

| Site: | Protectiveness Determination: | Addendum Due Date (if applicable): |
|---|---|---|
| Parcel UC-3 | Short-term Protective | Not Applicable |

**Protectiveness Statement:** The remedy at Parcel UC-3 is currently protective of human health and the environment. In order to determine whether the remedy can be considered protective in the long term, the radiological retesting work must be completed.

The RAOs for soil were met through hotspot excavation, durable covers, and ICs. Groundwater RGs have been met and groundwater meets the conditions for unlimited use/unrestricted exposure.

Radiological retesting is planned to confirm that levels in soil are protective of human health. Until retesting is complete, short-term protectiveness is met through Navy controls such as access to the parcel through fencing, locked gates, and ICs (restricting intrusive work and maintaining durable covers.

CH2M-0007-4930-0008

# 1.0    Introduction

This report was prepared by CH2M HILL, Inc., a wholly owned subsidiary of Jacobs, under Naval Facilities Engineering Systems Command (NAVFAC) Atlantic's Comprehensive Long-term Environmental Action—Navy (CLEAN) Contract Number N62470-21-D-0007, Contract Task Order N6247322F4930, for submittal to NAVFAC Southwest. This report details the Department of the Navy (Navy) Five-Year Review of Hunters Point Naval Shipyard (HPNS), San Francisco, California, as required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). HPNS (United States Environmental Protection Agency [USEPA] Identification: CA1170090087) was placed on the National Priorities List (NPL) in 1989. The Navy is the lead agency responsible for investigating and addressing the release of CERCLA hazardous substances at HPNS.

The Five-Year Review was conducted in accordance with CERCLA § 121(c), as amended by the Superfund Amendments and Reauthorization Act, and the National Oil and Hazardous Substances Pollution Contingency Plan, Part 300.430(f)(4)(ii) of the Code of Federal Regulations. The Five-Year Review was conducted in accordance with the following documents:

- *Comprehensive Five-Year Review Guidance* (USEPA, 2001) and supplements (USEPA, 2012a, 2012b, 2016)

- *Navy/Marine Corps Policy for Conducting Comprehensive Environmental Response, Compensation, and Liability Act Five-Year Reviews* (Navy, 2011)

- *Toolkit for Preparing Five-Year Reviews* (NAVFAC, 2013)

- *Defense Environmental Restoration Program (DERP) Management Manual Number 4715.20* (DoD, 2018)

- *Department of the Navy Environmental Restoration Program Manual* (Navy, 2018b)

This document has been prepared by the NAVFAC, Base Realignment and Closure (BRAC) Program Management Office (PMO) West for submittal to USEPA Region 9, California Department of Toxic Substances Control (DTSC), and the California Regional Water Quality Control Board, San Francisco Bay Region (Regional Water Board).

## 1.1    Purpose and Approach

The purpose of the Five-Year Review is to evaluate the implementation and performance of site remedies to determine whether these remedies are, and will continue to be, protective of human health and the environment in accordance with the requirements set forth in each of the decision documents. The Five-Year Review included a document and data review, required visual site inspections, and interviews. The methods, findings, and conclusions identified during the review are presented in this Five-Year Review Report.

A statutory Five-Year Review is required for sites where: (1) concentrations of hazardous substances, pollutants, or contaminants remain at the sites at levels above those that allow for unlimited use and unrestricted exposure (UU/UE), and (2) the Records of Decision (RODs) for the sites were signed on or after October 17, 1986 (the effective date of the Superfund Amendments and Reauthorization Act). The triggering action for statutory Five-Year Reviews at HPNS was the date of mobilization for the remedial action (RA) activities at Parcel B, which was July 8, 1998. The triggering action for this Fifth Five-Year Review is the signature of the Fourth Five-Year Review, July 31, 2019 (Navy, 2019).

## 1.2    Environmental Restoration Program

Following inclusion of HPNS on the NPL in 1989, in 1992, the Navy, USEPA, and California Environmental Protection Agency signed a Federal Facilities Agreement (FFA). In the FFA, sites proposed for characterization during the confirmation study were reclassified within the Remedial Investigation (RI)/Feasibility Study (FS) framework of CERCLA into Operable Units because the Navy's intent was to maintain HPNS as an active facility. The focus of the FFA was subsequently changed to expedite transfer and public reuse of HPNS, so the Navy and regulatory agencies divided HPNS into geographic parcels (Parcels A through E) in 1992. In 1996, a sixth parcel was added (Parcel F, the offshore area), which encompasses areas immediately adjacent to San Francisco Bay. The parcels were further divided to expedite transfer as follows:

- In 2008, the Navy subdivided Parcel D into four separate parcels (D-1, D-2, G, and UC-1) and separated the western edge of Parcel C to create Parcel UC-2. The Navy also separated Installation Restoration (IR) Sites 07 and 18 (referred to as IR-07/18) from Parcel B to expedite remedy completion and transfer of the sites.

- In 2012, the Navy separated the Crisp Road roadway and adjacent areas of Parcel E to create Parcel UC-3. The UC-series parcels encompass mostly roadways and were created to facilitate the overall transfer and development of HPNS.

- In 2013, the Navy subdivided Parcel B, excluding IR-07/18, into two separate parcels (B-1 and B-2) to accommodate varying property transfer schedules for different portions of the original parcel. In 2015, the Navy transferred Parcels D-2, UC-1, and UC-2 to the City and County of San Francisco's Office of Community Investment and Infrastructure (OCII).

**Figure 1-1** shows the current status and boundaries of the parcels.

Results of studies and initial response actions that were initiated before the FFA were incorporated, as appropriate, into additional investigations and studies in each major parcel. At each HPNS parcel, contaminated sites were designated as IR sites based on information developed during previous investigations. In most cases, IR sites were identified by a two-digit number (for example, IR-02). Site characterization activities and sampling data were mostly planned and organized by IR site. To assess risk, the BRAC Cleanup Team (BCT) agreed to divide all of HPNS into two different sized grids (residential and industrial) as a method of statistically calculating risk within an area for different future land use scenarios. RODs were prepared by parcel. **Figure 1-2** shows the parcel boundaries and locations of the IR sites across HPNS.

In general, remedies are applied by parcel with some exceptions for individual IR sites and remedial units (RUs), as discussed in their respective parcel sections of this Five-Year Review Report. The parcel sections are discussed by Former Parcels B, C, D, and E because all pre-ROD investigation work was completed before subdividing into smaller parcels to facilitate transfer. **Table 1-1** summarizes the major parcels or subdivided parcels, ROD signature date, basis for action, remedy components, Fourth Five-Year Review protectiveness determination, and inclusion in the Fifth Five-Year Review. **Table 1-2** summarizes IR sites present within each parcel.

CH2M-0007-4930-0008

## 1.3    Installation Background and Setting

This section provides background information on HPNS and consists of location and physical setting, geography, topography, geology and hydrogeology, and land and resource use. Information is summarized from the Fourth Five-Year Review (Navy, 2019) unless otherwise noted.

### 1.3.1   Location and Physical Setting

HPNS is located in the City and County of San Francisco, California (**Figure 1-1**). It encompasses 934 acres (491 acres on land and 443 acres under water in the San Francisco Bay) in southeastern San Francisco on a peninsula that extends east into San Francisco Bay. HPNS is currently divided into nine parcels (Parcels B-1, B-2, C, D-1, E, E-2, F, G, and UC-3) and two independent IR sites (IR-07/18) (**Figure 1-1**). HPNS formerly included Parcels A-1, A-2, D-2, UC-1, and UC-2, which since have been transferred out of federal ownership to the City and County of San Francisco OCII. Parcels A-1 and A-2 are acceptable for UU/UE and are not subject to the Five-Year Review. Issues affecting protectiveness were identified during the Fourth Five-Year Review for Parcels D-2, UC-1, and UC-2 and, although they are no longer under federal ownership, they are included in this Five-Year Review to document progress toward meeting the recommendations set forth in the Fourth Five-Year Review.

The Navy created most of the dry land portion of HPNS in the 1940s by excavating the hills surrounding the shipyard and using the resulting spoils to expand the shoreline into San Francisco Bay. Additional filling operations continued into the 1960s. The shoreline at HPNS is predominantly constructed seawalls, dry docks, engineered shoreline armoring and revetments, and seawalls. Shoreline and offshore areas at HPNS are considered environmentally sensitive areas, and effects to wildlife in environmentally sensitive areas were considered during the remedy selection and design process.

### 1.3.2   Topography

HPNS is characterized by a central hill (Former Parcel A) that slopes radially out to San Francisco Bay. Ground surface elevations of the parcels range from 30 to 60 feet above mean sea level (msl) near the landward edges and 0 feet above msl as they meet the bay. Large areas of HPNS are flat lowlands with elevations ranging from 10 to 15 feet above msl, where most of the Base roads, buildings, and operating areas were built.

### 1.3.3   Geology and Hydrogeology

The peninsula that forms HPNS is within a northwest-trending belt of Franciscan Complex Bedrock known as the Hunters Point Shear Zone. HPNS is underlain by five geologic units: the youngest being of Quaternary age and the oldest being the Franciscan Complex Bedrock of Jurassic-Cretaceous age. In general, the stratigraphic sequence of these geologic units, from youngest (shallowest) to oldest (deepest), is as follows: Artificial Fill, Undifferentiated Upper Sand Deposits, Bay Mud Deposits, Undifferentiated Sedimentary Deposits, and Franciscan Complex Bedrock. The Franciscan Complex contains a variety of rock types, including basalt, chert, sandstone, shale, and serpentinite. Some of these rock types contain wide-ranging concentrations of naturally occurring metals; serpentinite also contains naturally occurring asbestos minerals. Artificial Fill covers the entire surface, except for colluvium and alluvium on the hillside at the southern edge (Navy, 2009).

There are three hydrostratigraphic units that are relevant to environmental investigations at HPNS: (1) the A-aquifer, (2) the B-aquifer, and (3) the bedrock water-bearing zone. An aquitard composed of Bay Mud separates the A-aquifer and B-aquifer. The following is a summary of each unit (Navy, 2019):

- The **A-aquifer** is present throughout most of HPNS and primarily consists of heterogeneous Artificial Fill but may also consist of the following underlying layers: Undifferentiated Upper Sand Deposits, sandy units within the uppermost Bay Mud, and upper weathered bedrock zone. The A-aquifer is generally unconfined, but semiconfined conditions may exist where fine-grained sediments overlie more permeable materials. The aquifer ranges in thickness from a few feet to greater than 50 feet. Groundwater elevations range from about -1 to +7 feet relative to msl (TRBW, 2022). Primary sources of recharge for the A-aquifer are infiltration of precipitation and runoff, leakage from utilities, intrusion of bay water, horizontal flow of groundwater from upgradient areas, and vertical flow of water from the B-aquifer.

- **Bay Mud** acts as an aquitard that typically separates the A-aquifer from the underlying B-aquifer. The Bay Mud Deposits consist of highly plastic clay to sandy clay and generally thicken from 0 feet near the historical shoreline to more than 50 feet thick near the bay margin. The Bay Mud aquitard is absent in several locations across HPNS and in areas of bedrock highs. In most areas where the Bay Mud is absent, a Sandy Lean Clay layer is present which also acts as an aquitard.

- The **B-aquifer** consists of Undifferentiated Sedimentary Deposits in a sequence of relatively thick (about 30 to 40 feet), laterally continuous layers of sand and silty and clayey sand, which are separated by laterally continuous layers of silt and clay. The upper portions of the B-aquifer contain layers of less permeable silts and clay that impede downward migration, making the B-aquifer less likely to be affected by contamination from site activities. The uppermost B-aquifer generally corresponds to the upper 20- to 40-foot-thick layer of sand and silty sand of Undifferentiated Sedimentary Deposits. The B-aquifer is generally confined by the Bay Mud aquitard. In areas where the aquitard is absent, the A- and B-aquifers are in hydraulic communication and behave as a single aquifer. The primary sources of recharge for the B-aquifer include infiltration of precipitation and runoff and horizontal groundwater flow from upgradient areas.

- The **fractured water-bearing zone** consists of the deeper portions of saturated fractured bedrock that are not in direct contact with the A- or B-aquifers. The fractured, unweathered bedrock is not considered an aquifer because of its limited flow capability and low storage capacity. The bedrock water-bearing zone likely discharges into the B-aquifer at upgradient contacts and is recharged by infiltration of precipitation at landward outcrop areas.

## 1.3.4   Land and Resource Use

### 1.3.4.1  Past and Present Land Uses

Various industrial activities at HPNS, including shipbuilding and repair, metal working, degreasing, painting, foundry operations, radiological research, and other industrial operations, have resulted in a broad distribution of chemicals in soil, soil gas, sediment, groundwater, and structures. These chemicals include metals, volatile organic compounds (VOCs), semivolatile organic compounds (SVOCs) (including polycyclic aromatic hydrocarbons [PAHs]), pesticides, polychlorinated biphenyls (PCBs), total petroleum hydrocarbons (TPH), and radionuclides.

CH2M-0007-4930-0008

Bethlehem Steel owned and operated a commercial dry dock facility in the HPNS area until 1939 when the Navy purchased the property. Quays, docks, and support buildings were built on an expedited wartime schedule to support the shipyard's mission of fleet repair and maintenance. After the end of World War II, the Navy used the berthing facilities at HPNS for ships returning from the Pacific. By 1951, HPNS shifted from a general repair facility to specializing in submarine maintenance and repair but continued to operate Pacific Fleet carrier overhaul and ship maintenance repair facilities through the 1960s. During the 1950s and 1960s, until 1969, the Naval Radiological Defense Laboratory (NRDL) occupied buildings at HPNS to conduct practical and applied research on radiological decontamination methods and on the effects of radiation on living organisms and natural and synthetic materials. HPNS was disestablished as an active Naval facility in 1974 (NAVSEA, 2004).

From July 1, 1976, to June 30, 1986, the Navy leased 98 percent of HPNS to a private ship repair company, Triple A Machine Shop, Inc. (Triple A). Triple A used dry docks, berths, machine shops, power plants, various offices, and warehouses to repair commercial and Navy vessels. Triple A also subleased portions of the property to various other businesses. In 1986, the Navy resumed occupancy of HPNS. Triple A vacated the property in March 1987.

Currently, the San Francisco Police Department occupies a portion of Parcel E, and an artist colony occupies a portion of Parcel B-1. There are no other current land uses on Navy-owned property with the exception of environmental remediation activities.

### 1.3.4.2  Future Land Uses

The City and County of San Francisco OCII's HPNS Redevelopment Plan, developed in 1997 and amended in 2010 (SFRA, 2010) and 2018 (OCII, 2018), described the anticipated future use of HPNS. The Redevelopment Plan delineates "land use districts" in the subdivision of HPNS and describes the allowable uses within each land use district. **Figure 1-3** shows land use districts used at the time of the RODs, or ROD amendments, which were used for exposure scenario assumptions in human health risk assessments (HHRAs). The following is a summary of land use districts and associated HHRA exposure scenarios:

| Human Health Risk Assessment Exposure Scenario | Land Use District |
|---|---|
| Industrial Use | Education/Cultural (museums, cultural centers, civic, arts, and entertainment facilities) |
| | Industrial and Maritime-Industrial (light industrial use) |
| Residential Use | Research and Development (including some residential use) |
| | Mixed Use (including mixed density residential, commercial/retail) |
| Recreational Use | Open Space (parks and recreational areas) |

The HPNS Redevelopment Plan was updated in 2018 (OCII, 2018). The Navy will coordinate with the City of San Francisco to address any post-ROD changes needed for consistency with updated development plans and prepare appropriate post-ROD change documentation. Additionally, future land use will be required to comply with any environmental restrictions recorded in the Quitclaim Deed and Covenant to Restrict Use of Property developed during property transfer (OCII, 2018).

CH2M-0007-4930-0008

**Implementation of Institutional Controls**

The remedies for each parcel were selected and designed to be protective of human health and the environment for planned future land use. One component of the remedy is institutional controls (ICs), which are legal and administrative mechanisms used to implement land use restrictions that limit the exposure of future landowners or users of the property to hazardous substances present on the property and to ensure the integrity of the RA. ICs are required on a property where the selected remedial cleanup levels result in contamination remaining at the property greater than levels that allow for UU/UE. ICs will be maintained until the concentrations of hazardous substances in soil and groundwater are at such levels to allow for UU/UE. Implementation of ICs includes requirements for monitoring and inspections and reporting to ensure compliance with land use or activity restrictions.

Although ICs are implemented on a parcel-by-parcel basis, the ICs are consistently implemented across all parcels designated as areas requiring institutional controls (ARICs). **Table 1-3** presents a summary of each IC and respective performance objective and applicability by parcel. The land use and activity restrictions will be met by controlling access to each parcel until the time of transfer. The land use and activity restrictions are described in the Land Use Control (LUC) RD Reports referenced in each respective section and will be incorporated into the Quitclaim Deed and Covenant to Restrict Use of Property and will take effect upon transfer to the City and County of San Francisco's OCII and issuance of those documents. **Figure 1-4** presents the current proposed ARIC boundaries and ICs.

### 1.3.4.3 Surface Water and Groundwater Use

With the exception of Parcel F (sediments in the San Francisco Bay surrounding HPNS) and constructed wetlands at Parcel E, no permanent surface water features exist at HPNS. Surface water runoff flows to nearby San Francisco Bay or infiltrates into the ground. Groundwater beneath HPNS is not currently used for drinking water, irrigation, or industrial supply. The City and County of San Francisco supplies drinking water to HPNS through its municipal supply from the Hetch Hetchy watershed in the Sierra Nevada.

On September 25, 2003, Regional Water Board staff concurred with the Navy that A-aquifer groundwater at HPNS meets the exception criteria in the State Water Resources Control Board (SWRCB) Resolution No. 88-63, "Sources of Drinking Water"; therefore, groundwater in the A-aquifer is not suitable as a potential source of drinking water. Likewise, on July 29, 2008, Regional Water Board staff concurred with the Navy that B-aquifer groundwater in the central and southern area of Parcel C meets the exception criteria in SWRCB Resolution No. 88-63, "Sources of Drinking Water"; therefore, groundwater in the B-aquifer at those locations is not suitable as a potential source of drinking water.

Similar to the evaluation for SWRCB Resolution No. 88-63, the Navy concluded that maximum contaminant levels (MCLs) were not applicable or relevant and appropriate requirements (ARARs) for CERCLA cleanups at HPNS for the A-aquifer based on an evaluation of site-specific- factors (ChaduxTt, 2007; SulTech, 2007, 2008; Barajas & Associates, Inc., 2008; and ERRG and Shaw, 2011). Results of the evaluation of site-specific factors are as follows:

- There is no historical or current use of groundwater as a water supply.

- The City and County of San Francisco will not allow the use of groundwater for drinking water because the City of San Francisco prohibits installation of domestic wells within city boundaries.

CH2M-0007-4930-0008

- Arsenic and other metals occur in A-aquifer groundwater at ambient levels that exceed MCLs, and the cost to reduce concentrations of these chemicals to concentrations less than MCLs would likely be prohibitive, and it may be technically impracticable to do so.

- The proximity of saline groundwater and surface water from San Francisco Bay creates a high potential for saltwater intrusion if significant quantities are produced from the aquifer.

Future drinking water is expected to continue to be supplied by the city's municipal system. The RODs for the various parcels that require RAs all require ICs to prohibit the use of groundwater, and, consequently, future use of groundwater is expected to be prohibited, except for uses allowed by the RODs (for example, maintenance of groundwater monitoring wells). However, the potential use of groundwater in the B-aquifer, although unlikely, is considered in the risk evaluation and basis for action for each parcel, where applicable.

## 1.4    Basewide Considerations Relevant to the Five-Year Review Process

Basewide evaluations are being conducted to address per- and polyfluoroalkyl substances (PFAS), climate change, and radiological aspects that are relevant to evaluation of the remedies in this Five-Year Review. The status of these Basewide efforts are summarized in the following sections.

### 1.4.1    Per- and Polyfluoroalkyl Substances

The Navy and USEPA have identified certain PFAS compounds as emerging chemicals of environmental concern. PFAS have been used in a variety of industrial and military applications. Potential releases of PFAS resulting from historical activities conducted at Navy installations, such as use of aqueous film-forming foam (AFFF) during fire and emergency response, testing, and training activities or chromium plating operations, has prompted the Navy to develop and implement a PFAS preliminary assessment (PA)/site inspection (SI) process to identify and prioritize the investigation of sites with known or potential PFAS releases. The Department of Defense (DoD) released guidance related to the use of USEPA-issued Regional Screening Levels (RSLs) in PFAS investigations (ASD, 2023).

A Basewide PA for PFAS was completed in June 2022, which identified areas for further investigation based on historical site use or data collected during previous investigations (Multi-MAC JV, 2022). To provide for a more comprehensive and installation-wide assessment for the potential presence of PFAS at HPNS, groundwater in the A-aquifer zone within all parcels where industrial activities occurred (Parcels B-1, B-2, C, D-1, G, E, and E-2) was further investigated in a PFAS SI (Multi-MAC JV, 2022; Liberty JV, 2023a, 2023b). Because investigation of PFAS is ongoing and it has not yet been determined whether PFAS pose unacceptable risk that requires RA, and because a remedy for PFAS has not yet been determined, a protectiveness determination cannot be made. Rather, parcel-specific discussions as Other Findings in **Sections 3** through **6** present individual areas that were identified for further investigation under the SI, based on historical site use or data collected during previous investigations.

As presented in **Section 1.3.4.3,** groundwater within the A-aquifer (and portions of the B-aquifer within Parcel C) is unsuitable for drinking water. Additionally, the City and County of San Francisco prohibits installation of domestic wells within city and county limits.

For soil, the Navy maintains durable covers and implements ICs to restrict exposure to soil throughout all parcels at HPNS.

Regarding the potential pathway of groundwater discharge to surface water and exposure to aquatic receptors in the bay, the Navy's CERCLA PFAS SI data and existing site remedies were evaluated by the Navy. The following information and data support there is likely no imminent CERCLA risk:

- The highest PFAS concentrations were detected in wells in Parcel E-2 (including perfluorooctanoic acid [PFOA] at 18 micrograms per liter [µg/L]). This specific location is upgradient to the nearshore slurry wall and the slurry wall is designed to inhibit migration of chemicals of concern (COCs) in groundwater to the bay. The cement-bentonite mixture is expected to inhibit PFAS based on how they inhibit VOCs.

- The PFAS detections in other identified near shore perimeter groundwater wells across HPNS were 1 to 2 orders of magnitude lower than the highest concentration at Parcel E-2. The PFAS SI results at these wells ranged from 0.14 µg/L to a maximum concentration of 3.2 µg/L (perfluorooctane sulfonate [PFOS]).

- Published ecological screening values for aquatic receptors (Argonne, 2021) are as follows:
  - PFOS: 0.117 to 22.6 µg/L
  - PFOA: 6.12 to 1,580 µg/L

In summary, based on the above lines of evidence, there is no known imminent risk from PFAS to human or ecological receptors at HPNS.

## 1.4.2 Climate Resilience Assessment

The Navy recognizes climate change is occurring and based on a screening level evaluation (**Appendix A**), sea level rise (SLR) is the major variable of climate change that could affect the remedies at HPNS. The screening level climate resilience assessment (CRA) was conducted for HPNS by NAVFAC Expeditionary Warfare Center to assess how climate change-related hazards could potentially affect IR sites at HPNS. The CRA was conducted consistent with guidance provided in the *DoD Climate Assessment Tool (DCAT)* (DoD, 2020), USEPA's *Guidance on Climate Resilience in Superfund Planning* (USEPA, 2021), and the *Draft Sea Level Rise Guidance to DTSC Project Managers for Cleanup Activities* (DTSC, 2023). The CRA identified the coastal flooding caused by SLR as being the primary climate-related hazard for HPNS. Both permanent effects (seawater inundation and groundwater emergence) and transient effects (flooding from storm events) of SLR were assessed. SLR projections from the *DoD Regional Sea Level Database* (DoD, 2021) for the years 2035 and 2065 were used, with 1992 serving as the baseline year. The Navy has extensive groundwater elevation data collected annually from over 100 monitoring wells since 2002. The evaluation of this data shows groundwater level has a significant amount of variability from year to year and there is no consistent upward trend.

The initial evaluation identified the potential for permanent groundwater emergence impacts in approximately 2035 at D-1 and IR-07/18 and in approximately 2065 at B-1, B-2, C, D-1, E, and G. Parcels D-2, E-2, G, UC-1, UC-2, and UC-3 are not anticipated to be affected by SLR by 2065. No permanent seawater inundation is projected through 2065 in any of the parcels, but storm surges could lead to transient flooding in all parcels, except D-2 and UC-3, in approximately 2035 and 2065. Further study to validate these projections is needed to assess actual effects of SLR so that the Navy can evaluate, plan, and implement strategies to mitigate the impacts of SLR and groundwater emergence on its CERCLA remedies.

As recommended in Section 6.1 of the CRA (**Appendix A**), the Navy will continue to monitor ongoing groundwater concentration and elevation data onsite through the Basewide Groundwater Monitoring Program (BGMP) and evaluate this data as it relates to the effectiveness of site remedies. The Navy will also regularly evaluate nearby tidal gauge data to verify SLR projections. Additional site-specific vulnerability assessments may be conducted in a timely manner to determine site-specific impacts and what remedy modification may be required. The results of the CRA for each parcel are discussed in the Other Findings section for each respective parcel.

## 1.4.3   Radiological Retesting and Remediation Goal Evaluation

Radiological surveys and remediation were previously conducted at HPNS as part of a Basewide time-critical removal action (TCRA; Navy, 2006). The radiologically impacted sites evaluated under the TCRA were identified in the Historical Radiological Assessment (NAVSEA, 2004) and included soil and building structures located within Parcels B-1, B-2, C, D-1, D-2, E, G, UC-1, UC-2, and UC-3 (**Figure 1-5**). An independent third-party evaluation identified potential manipulation, falsification, and data quality issues with the TCRA data, (Navy, 2017a, 2017b, 2017c, 2017d, 2018a, 2018c). Radiological retesting, including sampling and surveys of soils previously investigated during sanitary sewer line and storm drain removal and resurvey of impacted buildings and former building sites conducted under the Basewide TCRA (Navy, 2006) is planned or ongoing at all affected parcels.

The Fourth Five-Year Review (Navy, 2019) identified this as an Issue and Recommendation as follows:

*Issue: The Navy has determined that a significant portion of the radiological survey and remediation work completed to date was not reliable because of manipulation and/or falsification of data by one of its radiological contractors. A long-term protectiveness evaluation of the radiological RGs has not yet been completed for this Fourth Five-Year Review, and it is currently not known if the RAOs for radionuclides have been achieved in Parcels B-1, B-2, C, D-1, D-2, G, E, UC-1, UC-2, and UC-3.*

*Recommendation: The Navy is in the process of implementing corrective actions to ensure that the radiological remedies specified in the decision documents are implemented as intended. In addition, the Navy is in the process of conducting a long-term protectiveness evaluation of the ROD radiological RGs. After finalization of the Five-Year Review, the Navy will issue a draft addendum evaluating the long-term protectiveness of the RGs for soil using RESRAD and the USEPA's Preliminary Remediation Goal (PRG) Calculator for radiation risk to human health. Another draft addendum evaluating the long-term protectiveness of the RGs for buildings (for both residential and commercial/industrial scenarios) will also be issued. The draft addenda will include explanations of the proposed site-specific inputs and will be issued to the public and regulatory agencies for a 30-day review and comment period. The Navy will prepare responses to regulatory agency comments and a responsiveness summary to comments from the public. The results of the final evaluations will inform the retesting sensitivity and cleanup thresholds. These risk evaluations may also inform future risk management decisions and the potential for post-ROD changes, if appropriate. It is anticipated that the radiological rework will be completed prior to the next Five-Year Review.*

### 1.4.3.1   Progress Since the Fourth Five-Year Review

The Navy is currently in the process of implementing corrective actions, which includes the radiological retesting of the impacted areas evaluated under the TCRA. Progress for each

CH2M-0007-4930-0008

parcel is discussed in their respective sections. Additionally, the Navy evaluated the radiological remediation goals (RGs) to ensure the radiological remedies will be protective in the long term, with human health risk within the risk range as described in the National Oil and Hazardous Substances Pollution Contingency Plan. Following the recommendation from the Fourth Five-Year Review, the Navy issued addendums evaluating the long-term protectiveness of the RGs for soil and building structures, which concluded that the current RGs are protective for all future land users (Navy, 2020a, 2020b). There was agency disagreement over the calculation methods for building RGs; however, the Navy is currently in the early planning stages to demolish all radiologically-impacted buildings at each parcel in response to a letter from the City of San Francisco's Office of Community Investment and Infrastructure, dated February 3, 2022, requesting that, before transferring the remaining Navy-owned property at HPNS, the Navy must demolish all remaining buildings (both radiologically impacted and nonradiologically impacted) on that property except for five small structures on the National Historic Register (OCII, pers. comm., 2022). The demolition and disposal of radiologically-impacted buildings will be completed under CERCLA. Details for managing radiological building materials during demolition will be documented in work plans for regulatory agency review. Because this is not an issue affecting protectiveness but will require a post-ROD change to document the increased cost, Explanations of Significant Differences will be prepared for each Parcel, as appropriate.

Radiological retesting is planned and/or currently underway to verify that the soil RGs, which were determined to be protective and remain valid, have been met for each parcel that was identified in the Fourth Five-Year Review.

## 1.4.4   Air Monitoring and Dust Control

Dust control is of paramount concern at HPNS and comprises two major goals of equal importance: (1) protection of worker safety and health and (2) protection of the nearby community and public at large. A dust control plan is included in Remedial Action Work Plans (RAWPs) for all onsite activities that have the potential to generate dust, including, but not limited to, installing durable covers, installing landfill caps, conducting radiological retesting and trenching activities, and initiating building demolition. Dust mitigation measures include the following: track-out control to dislodge any dirt adhering to tires, wetting soil during earthmoving and earth-disturbing activities and on stockpiles, minimizing the height from which soil is dropped during earthmoving activities, equipping trucks with tarping systems to cover loads during soil transport, minimizing truck traffic distances, and using real-time air monitoring.

Air monitoring is performed to confirm worker safety and provide reasonable assurance of the protection of the surrounding residents in accordance with National Institute for Occupational Safety and Health-approved air sampling methodology. The following three types of air monitoring are conducted during intrusive construction activities:

- Air quality monitoring for total suspended particulates, manganese, arsenic, lead, particulate matter less than 10 microns in diameter, and asbestos

- Air monitoring for radionuclides of concern (ROCs)

- Personnel monitoring

The air quality sampling will be used to assess the status of air quality compliance and to evaluate modifications to project activities in the event of compliance concerns. Representative meteorological data for the general project areas, specifically wind speed and direction, are used to identify the most appropriate locations for the air monitoring stations. Air samplers and

monitoring stations are located in the most practical locations upwind and downwind from the project site according to available wind speed and direction data. In addition, real-time air monitors are employed to provide immediate information for dust levels present at the site perimeter. The Navy provides updates to the community via a public website (Navy, 2024).

Available reports between November 2018 through November 2023 were reviewed for parcels with earthmoving activities. **Table 1-4** summarizes the type of work, date range, and findings during air monitoring. There were no major issues with air monitoring results identified during the monitoring period.

## 1.5    Report Organization

The Five-Year Review for HPNS consists of seven sections, organized as follows:

- **Section 1.0** — Introduces the Five-Year Review and its purpose and provides the background of HPNS.

- **Section 2.0** — Describes the Five-Year Review process.

- **Sections 3.0 through 7.0** — Evaluates each of the parcels included in the Fifth Five-Year Review. Discussion elements for each parcel include the site history and background; site chronology, and site characterization; description of RAs (remedy implementation and remedy operations and maintenance [O&M]); progress since the Fourth Five-Year Review; technical assessment; issues, recommendations, and follow-up actions; and statement of protectiveness. References, figures, and tables are provided at the end of each section.

Appendixes are provided at the end of the document.

## 1.6    References

Argonne National Laboratory (Argonne). 2021. *Derivation of PFAS Ecological Screening Values. Environmental Science Division, Argonne National Laboratory.* Completed under interagency agreement between the U.S. Department of Energy (DOE), Argonne National Laboratory (Argonne), and AFCEC. Final. September. https://www.denix.osd.mil/dodepa/denix-files/sites/85/2022/10/Final-PFAS-ESV-Report_Sept-2021_508.pdf.

Assistant Secretary of Defense (ASD). 2023. *Memorandum: Investigating Per- and Polyfluoroalkyl Substances within the Department of Defense Cleanup Program*. Updated August.

Barajas & Associates, Inc. (Barajas). 2008. *Revised Remedial Investigation Report for Parcel E, Hunters Point Naval Shipyard, San Francisco, California.* Final. May 2.

ChaduxTt, A Joint Venture of St. George Chadux Corp. and Tetra Tech EM Inc. (ChaduxTt). 2007. *Final Parcel B Technical Memorandum in Support of a Record of Decision Amendment, Hunters Point Shipyard, San Francisco, California*. December 12.

California Department of Toxic Substances Control (DTSC). 2023. *Sea Level Rise Guidance to DTSC Project Managers for Cleanup Activities.* Draft. February.

Department of Defense (DoD). 2018. *Defense Environmental Restoration Program (DERP) Management Manual Number 4715.20.* Change 1. August.

DoD. 2020. *DoD Climate Assessment Tool.* Office of the Deputy Assistant Secretary of Defense Environment & Energy. September.

CH2M-0007-4930-0008

DoD. 2021. *DoD Regional Sea Level Database*. Retrieved from Regional Sea Level Scenarios for Coastal Risk Management: https://drsl.serdp-estcp.org/Site.

Department of the Navy (Navy). 2006. *Final Basewide Radiological Removal Action, Action Memorandum – Revision 2006, Hunters Point Shipyard, San Francisco, California.* April 21.

Navy. 2009. *Amended Parcel B Record of Decision, Hunters Point Naval Shipyard, San Francisco, CA*. Final. January 14.

Navy. 2011. *Navy/Marine Corps Policy for Conducting Comprehensive Environmental Response, Compensation, and Liability Act Five-Year Reviews*. June.

Navy. 2017a. *Radiological Data Evaluation Findings Report for Parcels B and G Soil*. Former Hunters Point Naval Shipyard, San Francisco, California. Draft. September.

Navy. 2017b. *Radiological Data Evaluation Findings Report for Parcel C Soil, Former Hunters Point Naval Shipyard, San Francisco, California*. Preliminary Draft. October.

Navy. 2017c. *Radiological Data Evaluation Findings Report for Parcels D-2, UC-1, UC-2, and UC-3 Soil, Former Hunters Point Naval Shipyard, San Francisco, California*. Draft. October.

Navy. 2017d. *Radiological Data Evaluation Findings Report for Parcel E Soil, Former Hunters Point Naval Shipyard, San Francisco, California*. Draft. December.

Navy. 2018a. *Building Data Initial Evaluation Report. Former Hunters Point Naval Shipyard, San Francisco, California*. Draft. February.

Navy. 2018b. *Department of the Navy Environmental Restoration Program Manual.*

Navy. 2018c. *Site IR 07 and Site IR-18 Data Initial Evaluation Report, Former Hunters Point Naval Shipyard, San Francisco, California.* Preliminary Draft. July.

Navy. 2019. *Fourth Five-Year Review, Hunters Point Naval Shipyard, San Francisco, California.* July.

Navy. 2020a. *Addendum to the Five-Year Review, Evaluation of Radiological Remedial Goals for Soil, Hunters Point Naval Shipyard, San Francisco, California.* June 18.

Navy. 2020b. *Addendum to the Five-Year Review, Evaluation of Radiological Remedial Goals for Building Structures, Hunters Point Naval Shipyard, San Francisco, CA*. June 18.

Navy. 2024. *Documents: Air Monitoring.* https://www.bracpmo.navy.mil/BRAC-Bases/California/Former-Naval-Shipyard-Hunters-Point/Documents/#air-monitoring.

Engineering/Remediation Resources Group, Inc. (ERRG). 2014. *Design Basis Report, Parcel E-2, Hunters Point Naval Shipyard, San Francisco, California*. Final. August 15.

Engineering/Remediation Resources Group, Inc. and Shaw Environmental (ERRG and Shaw). 2011. *Remedial Investigation/Feasibility Study Report for Parcel E-2, Hunters Point Shipyard, San Francisco, California.* Final. May 5.

Liberty Joint Venture (Liberty JV). 2023a. *Work Plan Site Inspection for Basewide Investigation of Per- and Polyfluoroalkyl Substances, Former Hunters Point Naval Shipyard, San Francisco, California.* Final. March.

Liberty Joint Venture (Liberty JV). 2023b. *Site Inspection for Basewide Investigation of Per- and Polyfluoroalkyl Substances, Former Hunters Point Naval Shipyard, San Francisco, California.* Final. September.

CH2M-0007-4930-0008

Multi-MAC Joint Venture (Multi-MAC JV). 2022. *Preliminary Assessment Report Basewide Investigation of Per- and Polyfluoroalkyl Substances (PFAS), Former Hunters Point Naval Shipyard, San Francisco, California.* June.

Naval Facilities Engineering Command (NAVFAC). 2013. *Toolkit for Preparing Five-Year Reviews.* December 19.

Naval Sea Systems Command (NAVSEA). 2004. *Final Historical Radiological Assessment, History of the Use of General Radioactive Materials, 1939 – 2003, Hunters Point Shipyard.* October.

San Francisco Office of Community Investment and Infrastructure (OCII). 2018. *Redevelopment Plan for the Hunters Point Shipyard Project Area.* July 16 (Amendment to July 14, 1997 plan and August 3, 2010 and June 22, 2017 amendments).

OCII. 2022. Personal communication (letter) to Kimberly A. Ostrowski, Director, Naval Facilities Engineering Command, Base Realignment and Closure Program Management Office, West. *RE: Demolition of the Existing Non-Historic Buildings at the former Hunters Point Naval Shipyard in San Francisco, California.* February 3.

San Francisco Redevelopment Agency (SFRA). 2010. *Hunters Point Shipyard Redevelopment Plan.* August 3 (amendment to July 14, 1997, Redevelopment Plan).

SulTech. 2007. *Final Revised Feasibility Study for Parcel D, Hunters Point Shipyard, San Francisco, California*. November 30.

SulTech. 2008. *Final Feasibility Study Report for Parcel C, Hunters Point Shipyard, San Francisco, California*. July 31.

Trevet-Bay West JV LLC (TRBW). 2022. *2021 Basewide Annual Groundwater Monitoring Report, Hunters Point Naval Shipyard, San Francisco, California*. Final. August.

United States Environmental Protection Agency (USEPA). 2001. *Comprehensive Five-Year Review Guidance.* Office of Emergency and Remedial Response. EPA 540-R-01-007. OSWER No. 9355.7-03B-P. June.

USEPA. 2012a. *Clarifying the Use of Protectiveness Determinations for CERCLA Five-Year Reviews.* September.

USEPA. 2012b. *Assessing Protectiveness at Sites for Vapor Intrusion: Supplement to the Comprehensive Five-Year Review Guidance.* November.

USEPA. 2016. *Recommended Five-Year Review Template*. January.

USEPA. 2021. *Memorandum: Consideration of Climate Resilience in the Superfund Cleanup Process for NonFederal National Priorities List Sites.* Washington, D.C.

CH2M-0007-4930-0008

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

This page intentionally left blank.

CH2M-0007-4930-0008

Table 1-1. Summary of Hunters Point Naval Shipyard Parcels for Five-Year Review

| Parcel | | ROD Signature Date | Basis for Action | Remedy Components | Fourth Five-Year Review Protectiveness Determination | Inclusion in the Fifth Five-Year Review | Fifth Five-Year Review Protectiveness Determination |
|---|---|---|---|---|---|---|---|
| A | | 11/16/1995 | None | Not Applicable | Not Applicable | No | Not Applicable |
| IR-07/18 | | | | Soil excavation and offsite disposal<br>Durable covers to prevent exposure to COCs and ROCs<br>Monitoring for methane in soil gas<br>Monitoring for COCs and ROCs in groundwater<br>Radiological scanning and excavation and disposal of anomalies<br>ICs | Protective | Yes | Protective |
| B | B-1 | ROD: 10/7/1997<br>ESD: 8/24/1998<br>ESD: 5/4/2000 Amended<br>ROD: 1/14/2009 | Human Health Risks - exposure to chemicals in soil, soil gas, groundwater<br><br>Ecological Risks - exposure to chemicals in sediment and groundwater to surface water pathway<br><br>Radiologically Impacted Media | Soil excavation and offsite disposal<br>Durable covers to prevent exposure to COCs<br>SVE<br>In situ biological treatment for VOCs in groundwater<br>Monitoring for COCs in groundwater<br>Excavation and disposal of radiologically impacted soil and structures<br>Radiological scanning and unrestricted release of buildings, former building sites, and radiologically impacted areas<br>ICs | Will be protective | Yes | Short-term Protective |
| | B-2 | | | Soil excavation and offsite disposal<br>Durable covers to prevent exposure to COCs<br>In situ stabilization of metals in groundwater<br>Monitoring for COCs in groundwater<br>Excavation and disposal of radiologically impacted soil and structures<br>Radiological scanning and unrestricted release of buildings, former building sites, and radiologically impacted areas<br>ICs | Will be protective | Yes | Protectiveness Deferred |

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

## Table 1-1. Summary of Hunters Point Naval Shipyard Parcels for Five-Year Review

| Parcel | ROD Signature Date | Basis for Action | Remedy Components | Fourth Five-Year Review Protectiveness Determination | Inclusion in the Fifth Five-Year Review | Fifth Five-Year Review Protectiveness Determination |
|---|---|---|---|---|---|---|
| C | ROD: 9/30/2010 ESD: 10/2014 | Human Health Risks – exposure to chemicals in soil, soil gas, groundwater  Ecological Risks – groundwater to surface water pathway only  Radiologically Impacted Media | Soil excavation and offsite disposal  Durable covers to prevent exposure to COCs  In situ remediation (ZVI, biological treatment) and performance monitoring for COCs in groundwater  MNA for COCs in groundwater  SVE  Excavation and disposal of radiologically impacted soil and structures  Radiological scanning and unrestricted release of buildings, former building sites, and radiologically impacted areas  ICs | Will be protective | Yes | Protectiveness Deferred |
| UC-2 | 12/17/2009 | Human Health Risks – exposure to chemicals in soil, soil gas, groundwater  Radiologically Impacted Media | Durable covers to prevent exposure to COCs  Monitoring for COCs in groundwater  Decontamination or dismantling and offsite disposal of radiologically impacted structures  Excavation and disposal of radiologically impacted storm drain and sanitary sewer lines and associated soil  Radiological scanning unrestricted release ICs | Short-term protective | Yes | Short-term Protective |
| D | D-1 | 12/17/2009 | Human Health Risks – exposure to chemicals in soil, soil gas, groundwater  Ecological Risks – groundwater to surface water pathway only  Radiologically Impacted Media | Soil excavation and offsite disposal  Durable covers to prevent exposure to COCs  In situ remediation for groundwater (not necessary after completion of pre-ROD pilot study)  MNA for COCs in groundwater  Excavation and disposal of radiologically impacted soil and structures  Radiological scanning and unrestricted release of buildings, former building sites, and radiologically impacted areas  ICs | Short-term protective | Yes | Short-term Protective |

**Table 1-1. Summary of Hunters Point Naval Shipyard Parcels for Five-Year Review**

| Parcel | ROD Signature Date | Basis for Action | Remedy Components | Fourth Five-Year Review Protectiveness Determination | Inclusion in the Fifth Five-Year Review | Fifth Five-Year Review Protectiveness Determination |
|---|---|---|---|---|---|---|
| UC-1 | 12/17/2009 | Human Health Risks - exposure to chemicals in soil and soil gas<br><br>Radiologically Impacted Media | Durable covers to prevent exposure to COCs<br>Decontamination or dismantling and offsite disposal of radiologically impacted structures<br>Excavation and disposal of radiologically impacted storm drain and sanitary sewer lines and associated soil<br>Radiological survey and unrestricted release<br>ICs | Short-term protective | Yes | Short-term Protective |
| D-2 | 8/9/2010 | None | No Further Action - At the time of the ROD, the basewide radiological TCRA had addressed all potential risks associated with radionuclides; included in Fourth Five-Year Review because of ongoing radiological re-scan | Short-term protective | Yes | Short-term Protective |
| D<br><br>G | ROD: 2/18/2009<br>ESD: 4/18/2017 | Human Health Risks - exposure to chemicals in soil, soil gas, groundwater<br><br>Ecological Risks - groundwater to surface water pathway only<br><br>Radiologically Impacted Media | Soil excavation and offsite disposal<br>Durable covers to prevent exposure to COCs<br>In situ remediation for groundwater (not necessary after completion of pre-ROD pilot study)<br>MNA for COCs in groundwater<br>Excavation and disposal of radiologically impacted soil and structures<br>Radiological scanning and unrestricted release of buildings, former building sites, and radiologically impacted areas<br>ICs | Short-term protective | Yes | Short-term Protective |

## Table 1-1. Summary of Hunters Point Naval Shipyard Parcels for Five-Year Review

| Parcel | ROD Signature Date | Basis for Action | Remedy Components | Fourth Five-Year Review Protectiveness Determination | Inclusion in the Fifth Five-Year Review | Fifth Five-Year Review Protectiveness Determination |
|---|---|---|---|---|---|---|
| E | 12/1/2013 | Human Health Risks - exposure to chemicals in soil, soil gas, groundwater<br><br>Ecological Risks - exposure to chemicals in shoreline sediments, groundwater to surface water pathway<br><br>Presence of NAPL<br><br>Radiologically Impacted Media | Excavation and offsite disposal of soil and sediment<br>Closure of steam and fuel line systems potentially acting as an ongoing source of contamination<br>Durable covers to prevent exposure to COCs and ROCs<br>SVE<br>In situ treatment of groundwater<br>In situ treatment and removal of NAPL<br>Below-grade barriers (slurry wall) to limit COC migration in groundwater and NAPL migration<br>Monitoring of groundwater COCs<br>Excavation and disposal of radiologically impacted structures and soil<br>Radiological scanning and unrestricted release of buildings and former building sites<br>ICs | Will be protective | Yes | Will Be Protective |
| E-2 | 11/1/2012 | Human Health Risks - exposure to chemicals in soil, landfill gas, groundwater<br><br>Ecological Risks - exposure to chemicals in shoreline sediments, groundwater to surface water pathway<br><br>Presence of Waste<br><br>Radiologically Impacted Media | Excavation and offsite disposal of soil and sediment<br>Durable covers to prevent exposure to COCs<br>Landfill cap to prevent exposure to COCs and landfill material<br>Collection, treatment, and monitoring of landfill gas<br>In situ treatment of groundwater COCs<br>Below-grade barriers to limit groundwater migration into and out of landfill material<br>Monitoring of groundwater COCs and landfill compliance monitoring<br>Radiological scanning and treatment of radiologically impacted materials during remedy implementation<br>Radiological survey of final cover<br>ICs | Will be protective | Yes | Will Be Protective |

1.0 INTRODUCTION

## Table 1-1. Summary of Hunters Point Naval Shipyard Parcels for Five-Year Review

| Parcel | ROD Signature Date | Basis for Action | Remedy Components | Fourth Five-Year Review Protectiveness Determination | Inclusion in the Fifth Five-Year Review | Fifth Five-Year Review Protectiveness Determination |
|---|---|---|---|---|---|---|
| E | 1/1/2014 | Human Health Risks - exposure to chemicals in soil, soil gas, groundwater <br><br> Radiologically Impacted Media | Durable covers to prevent exposure to COCs <br> In situ treatment of VOCs in groundwater <br> Monitoring for COCs in groundwater <br> Excavation and disposal of radiologically impacted storm drain and sanitary sewer lines and associated soil <br> Radiological scanning unrestricted release <br> ICs | Short-term protective | Yes | Short-term Protective |
| F | PENDING | Human Health Risks - consumption of seafood <br><br> Ecological Risks - exposure to chemicals in sediment | Focused removal of sediment and backfill with clean fill <br> Capping to prevent exposure to COCs in sediment <br> Monitored natural recovery <br> ICs | Not Applicable (ROD was not signed) | No | Not Applicable |

COC = chemical of concern
ESD = Explanation of Significant Differences
IC = institutional control
MNA = monitored natural attenuation
NAPL = nonaqueous phase liquid
ROC = radionuclide of concern
ROD = Record of Decision
SVE = soil vapor extraction
TCRA = time-critical removal action
VOC = volatile organic compound
ZVI = zero-valent iron

CH2M-0007-4930-0008

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

1.0 INTRODUCTION

This page intentionally left blank.

CH2M-0007-4930-0008

1.0 INTRODUCTION

**Table 1-2. Installation Restoration Site Summary**

| Parcel | Site | Site Name and Status | Location, Description, and Site Background | Reference |
|---|---|---|---|---|
| | IR-45 | Steam Lines; Transferred | The steam line system, referred to as SI-45, was investigated as part of the 1993 SI to evaluate whether the system contained waste oil. The steam lines in Parcel A did not contain waste oil, and it was concluded that no further investigation was required. | Gilbane, 2016; Gilbane, 2018 |
| | IR-49 | Fuel Distribution System; Closed | IR Site 49 includes all of the fuel lines in Parcel C. The lines were investigated as part of the Parcel C RI and a TCRA was completed in 2001 to close an area centered on the east-west-trending main fuel line and north-south-trending North Slip lateral fuel line. Additional sampling at a portion of the site (AOC 49B) concluded that there were no unacceptable risks to human health and the environment from exposure to petroleum hydrocarbons and risk would be further mitigated by the durable cover remedy in Parcel C. | Gilbane, 2016 |
| Facility-wide | IR-50 | Storm Drain and Sanitary Sewer Systems; Transferred | The storm drains and sanitary systems, referred to as SI-50, were investigated as part of the 1993 SI. Visual inspection and sampling were performed to document the quality of the water and sediment, and it was concluded that no further investigation was required. Pesticides and herbicides were detected, but at concentrations that did not pose a threat to human health or the environment. | Tetra Tech, 1998 |
| | IR-51 | Former Transformer Sites; Transferred | The transformers of Parcel A are referred to collectively as SI-51. The former locations of the transformers were visually inspected for stains that might indicate a release of oil that contains PCBs during the 1993 SI. All transformers have since been removed and inspected (and sampled if necessary). The inspections indicated that no PCB-containing oils had leaked into the surrounding environment, and no further investigation was recommended. | Tetra Tech, 1998 |
| IR-07/18 | IR-07 | IR Site 7; RA Completed | IR Site 7 is approximately 10.6 acres in the northwestern corner of the Former HPNS along the property line and adjacent to San Francisco Bay. Historical activities at IR Site 7 that may have contributed to contamination in soil include sandblasting and disposal of sandblast grit and debris. Investigations were performed from 1991 to 2007. Most of IR Site 7 was excavated to a depth of 10 feet bgs from 1998 to 2001. In 2008, approximately 17,000 cubic yards of soil were excavated to address methane. In 2012, a durable cover was installed to address potential risk from the remaining ubiquitous metals, and a shoreline revetment was added to provide a physical barrier to prevent exposure of humans and wildlife to remaining COCs. Pesticides were not a COC post remediation. | TriEco-Tt, 2013; Westec, 1984; SFBRWQCB, 2012 |
| | IR-18 | IR Site 18; RA Completed | IR Site 18, a 3.6-acre area near the northern tip of the Former HPNS, is in the paved parking lot adjacent to Earl Street west of IR Site 7. Triple A allegedly disposed of 50,000 to 100,000 gallons of waste oil and other liquids on the ground at this site, which was subsequently paved with asphalt. Investigations were performed from 1991 to 2007. Similar to IR Site 7, soil excavation was performed from 1998 to 2001 to a depth of 10 feet bgs. In 2012, a durable cover was installed to address potential risk from the remaining ubiquitous contaminants to provide a physical barrier to prevent exposure of humans and wildlife to remaining COCs. Pesticides were not a COC post remediation. | TriEco-Tt, 2013; Westec, 1984; HLA, 1989; SFBRWQCB, 2012 |
| | IR-10 | Battery and Metal Plating Shop; Open, Remedial Monitoring | IR Site 10 is in the northern portion of the Former HPNS. There was a battery and electroplating shop in Building 123 from 1944 to 1974. Acids, chromates, and heavy metals from this operation were discharged to the storm drain system by the plating shop. Cyanide wastes were also generated but were disposed of separately and transported to the landfill. In 1974, the Navy leased the building to Triple A, which used the building as a commercial warehouse. Investigations and interim actions were performed from 1989 to 2009. Soil vapor extraction and zero valent iron injection were conducted to treat VOCs. Active remediation and PFAS investigation is ongoing at this site. | TriEco-Tt, 2013 |
| Parcel B-1 | IR-20 | IR Site 20; RA Completed | IR Site 20 is in the northern portion of the Former HPNS and is adjacent to Parcel C. Building 156 was used to manufacture rubber parts for ships and was later used as a storage building for marine supplies. Building 163 was used as the Rubber Shop Annex used for storage. Investigations began in 1993 and excavations were conducted from 1996 to 1999. In 2012, a durable cover was installed to minimize human exposure to the potentially contaminated soil beneath the cover. The Building 156 foundation is considered part of the durable cover for the Parcel B-2 remedy. | PRC, 1994a; Tetra Tech, 1998; HLA, 1994; TriEco-Tt, 2013; NAVSEA, 2004 |
| | IR-23 | IR Site 23; RA Completed | IR Site 23 is at the northern tip of the Former HPNS. Building 146 was used as an industrial and photography development laboratory, general shops, radioactive waste storage area, and radio luminescent device turn-in building. Building 121 was a former civil training center. The area previously contained unnamed ASTs. Investigations were performed from 1986 to 2008. Interim excavations took place in 1996. An unnamed, 370-gallon fuel UST was removed in 1993. In 2012, a durable cover was installed to minimize human exposure to the potentially contaminated soil beneath the cover. The foundations of Buildings 121 and 146 are considered part of the durable cover for the Parcel B-2 remedy. | TriEco-Tt, 2013; Tetra Tech, 2006; PRC, 1994a; HLA, 1994 |
| | IR-24 | IR Site 24; Cleanup Completed | IR Site 24 is on the northern boundary of the Former HPNS and was used for general berthing and dry docking of small vessels and submarines. Building 125 was used as a cafeteria servicing the submarine servicemen and was later leased to a cabinet maker. Building 128 was the former Shop Service and Work Control Center No.1 and was later used for storage. Building 130 was used as machine shop, metal working shop, and pipe fitter's shop. Building 131 was the former electrical substation U. Building 159 was a latrine. Investigations began in 1991 and excavations were conducted from 1998 to 1999 and from 2000 to 2001. In 2007, trenching and soil removal were conducted as part of the CERCLA Radiological Program Sanitary Sewer and Storm Drain Removal Project, and petroleum-related staining and odor were observed in a trench just south of Building 125. In 2009, additional investigation and removal activities were performed. | TriEco-Tt, 2013; PRC, 1994a; AMEC, 2016 |

1-21

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

1.0 INTRODUCTION

**Table 1-2  Installation Restoration Site Summary**

| Parcel | Site | Site Name and Status | Location, Description, and Site Background | Reference |
|---|---|---|---|---|
| | IR-42 | IR Site 42; RA Completed | IR Site 42 is in the northern portion of the Former HPNS and is adjacent to Parcel A. Building 109 was used as the base police station and was leased to the San Francisco Police Department. Building 113 was used as a tug maintenance shop, salvage diver facility, and torpedo storage and overhaul building. It was also used by the San Francisco Police Department for storage. Building 114 (formerly 113A) was a machine shop and maintenance shop. It was leased to Smith-Emery Co. for testing concrete, soil, and windows. Apparently, radioactive material was used in Building 113A because X-rays were taken and developed. In 2012, a durable cover was installed to minimize human exposure to the potentially contaminated soil beneath the cover. The foundations of Buildings 109, 113, and 114 (113A) are considered part of the durable cover for the Parcel B-2 remedy. | TriEco-Tt, 2013; PRC, 1994a; PRC, 1994b; Tetra Tech, 1998a; HLA, 1994; NAVSEA, 2004 |
| | IR-60 | IR Site 60; RA Completed | IR Site 60 includes Dry Docks 5, 6, and 7 and is in the northeastern section of the Former HPNS adjacent to Parcel B. Building 145 was a saltwater pump house to use sea water for firefighting. Investigations began in 1993 and excavations were conducted in 1998 and 1999. In August 2011, the Navy submitted a site closeout report requesting regulatory site closure. | Tetra Tech, 1998; PRC, 1994b; TriEco-Tt, 2013; |
| Parcel B-1 | IR-61 | IR Site 61; RA Completed | IR Site 61 is in the central area of Parcel B-1. Building 122 was a former electrical substation V and Compressor Plant. Investigations began in 1995 and excavations were conducted in 1998 and 1999. In 2007, trenching and soil removal was conducted as part of the CERCLA Radiological Program Sanitary Sewer and Storm Drain Removal Project, and petroleum-related staining and odor were observed in a trench near an unidentified pipeline. In 2009, an investigation was performed as a result of this discovery. In 2012, a durable cover was installed to minimize human exposure to the potentially contaminated soil beneath the cover. The Building 122 foundation is considered part of the durable cover for the Parcel B-2 remedy. | Tetra Tech, 1998; HLA, 1994 |
| | IR-62 | IR Site 62; RA Completed | IR Site 62 is in the central area of Parcel B-1 approximately 100 feet southwest of the intersection of English and Lockwood Streets. Building 115 was a former submarine office and training school. A transformer was located at the northeastern corner of the building. A large blower-like machine and concrete sump with a steel storage tank were in the southwestern part of the first floor. As of 1994, the building was leased to New World Design, a home-building and cabinetry company that uses glues and stains. Building 116 was the Navy Reserve Drill Hall and was later leased to furniture, cabinet makers, and artists. In 2012, a durable cover was installed to minimize human exposure to the potentially contaminated soil beneath the cover. The foundations of Buildings 115 and 116 are considered part of the durable cover for the Parcel B-2 remedy. | PRC, 1994a; PRC, 1994b; Tetra Tech, 1998; TriEco-Tt, 2013; NAVSEA, 2004 |
| Parcel B-2 | IR-26 | IR Site 26; Open | IR Site 26 is in the northeastern tip of the Former HPNS for support of dry dock activities and ship sandblasting. Surface spills of petroleum hydrocarbons and chemical releases were suspected. Building 140 was a Dry Dock 3 Pump House, and former Building 141 was a Dock Shopwright's Shop. Former Building 157 was a Q&RA Industrial Laboratory, Metal Fabrication Branch. Soil excavation was completed in 2000 for multiple chemicals and in 2008 to remove a mercury source on the site. Groundwater monitoring indicates that mercury may have discharged to San Francisco Bay, and groundwater treatment was implemented. Groundwater at IR Site 26 continues to be monitored as part of the Basewide monitoring program and additional data needs or remedial actions will be evaluated as recommended in this Five-Year Review. | TriEco-Tt, 2013; Tetra Tech, 1998; PRC, 1994a; KMEA MACTEC JV, 2017 |
| | IR-46 | IR Site 46; RA Completed | IR Site 46 consisted of the Parcel B fuel distribution lines. The site is south of Building 130 (Parcel B-2). Investigations began in 1993, and excavations were conducted from 1998 to 1999 and from 2000 to 2001. | Tetra Tech, 1998 |
| Parcel C and UC-2 | IR-06 | IR Site 6; RA Completed | IR Site 6 is west of the intersection of Robinson Street and Lockwood Street and was used as a tank farm since the early 1940s. The tanks were used to hold diesel fuel and lubricating oil. Reportedly, in the early 1940s, there was a major spill of diesel fuel caused by a ruptured tank and cleanup actions were conducted. The Navy removed the ASTs, subsurface fuel distribution lines, and more than 6,000 cubic yards of contaminated soil in 1993. | Westec, 1984 |
| Parcel C | IR-25 | IR Site 25; RA Completed | IR Site 25 is located on the boundary of Parcel B-1 and Parcel C and is in the diesel engine and gun overhaul area. Building 124 was used as an acid mixing plant. Building 134 was used as a machine shop, Q&RA offices, and central tool room. Building 134 was used for marine refrigeration. The Building 134 foundation is considered part of the durable cover for the Parcel C remedy. | PRC, 1994a; AMEC, 2016; Tetra Tech, 1998 |
| | IR-27 | IR Site 27; RA Completed | IR Site 27 is at the northeastern tip of the Former HPNS between Dry Docks 2 and 3. Building 205 was the Dry Dock 2 pump and compressor plant. IR Site 27 included UST S-214, which was located between Buildings 204 and 205. The 22,000-gallon UST was used to store fuel oil for the boiler units inside Building 205. The UST was closed in place. | PRC, 1994a; AMEC, 2016; Tetra Tech, 1998 |

CHEM-0007-4930-0008

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

## Table 1-2  Installation Restoration Site Summary

| Parcel | Site | Site Name and Status | Location, Description, and Site Background | Reference |
|---|---|---|---|---|
| | IR-28 | IR Site 28; Open | IR Site 28 is located on the eastern side of the Former HPNS adjacent to San Francisco Bay. IR Site 28 is the largest area of Parcel C and was used predominantly for ship repair and to a lesser extent shipping, office, and commercial activities. Building 251 was used as the industrial relations and central tool room. Building 258 was used as pipe-cleaning shop. Building 281 was used as the electronics-weapons precision facility and was later leased to Oakland Naval Supply for storage. Building 228 was a cafeteria. Building 230 was as a Shop Service building. As of 1994, ERMICO Enterprises, Inc., was leasing the building to manufacture skateboard wheels. Buildings 270 and 271 were paint shops. Buildings 219, 229, and 273 were electrical substations. Building 231 was used as a machine shop. There was a former drum storage area near Building 251. Building 241 was used as a brine line to Building 224 was used as air raid shelter and was later used to store radiological material. The first floor of building 253 was used as ordnance shop for cleaning, paint stripping, and painting. The second, fourth, and fifth floors of Building 253 were used as an electronic and optical shop. Wastewater from the condensate collection drum was manually transferred periodically into a 21,000-gallon, double-contained holding tank north of Building 253. Small Buildings 214, 218, and 252 were used as an office, latrine, and bus terminal, respectively. During the 1994 SI, leaking equipment, spills, surface staining, chemical residues, periodic discharges, and generally poor housekeeping practices were observed. The foundations of Buildings 251, 258, 281, 230, 270, 271, 219, 229, 273, 231, 224, 218, and 252 are considered part of the durable cover for the Parcel C remedy. | HLA, 1994; TriEco-Ti, 2013; Aptim, 2017; Westec, 1984; PRC, 1994a; AMEC, 2016; Tetra Tech, 1998 |
| | IR-29 | IR Site 29; RA Completed | IR Site 29 is in the western portion of Parcel C. Building 203 was the former boiler room and main power plant. A 500-gallon UST was located immediately south of Building 203 and was used to supply gasoline to a rental engine inside the building. This UST was removed in 1991. A 210,000-gallon fuel oil UST and a 14,000-gallon brine UST were south of Building 203. Both tanks were closed in place in 1991. Two fuel oil USTs and one 35,000-gallon water UST were along the eastern side of Building 203 and were removed in 1993. Buildings 217 and 275 were used for sheet metal production, photo engraving, welding, and painting and were later used as a warehouse and storage area for furniture. Building 279 was used as materials storage. Building 280 was used as an aluminum cleaning facility. Building 282 was used as an abrasive blast facility to remove paint. The Building 203, 217, 275, 279, 280, and 282 foundations are considered part of the durable cover for the Parcel C remedy. | PRC, 1994a; AMEC, 2016; Tetra Tech, 1998; HLA, 1994 |
| Parcel C | IR-30 | IR Site 30; RA Completed | IR Site 30 is in the western corner of Parcel C. Building 241 was used as a forge and metal heat-treating facility. The building contained two large oil-containing vats that were used as baths for quenching metal and numerous ovens with asbestos lining. The building was leased to Golden Gate Heat Treating. The Building 241 foundation is considered part of the durable cover for the Parcel C remedy. | Trevet, 2017; HLA, 1994 |
| | IR-57 | IR Site 57; RA Completed | IR Site 57 is in the southern portion of Parcel C surrounding Dry Dock 4. Building 300 was a Substation N. Building 301 was a latrine. Building 367 was a former Ship Supervisor Field Office. Buildings 300, 301, and 367 were all subleased to Astoria Metals along with Dry Dock 4. The site is centered on two EEs. EE-06 and EE-07, conducted in 1996. EE-06 targeted the removal of arsenic and TPH-diesel. Approximately 91 cubic yards of soil were removed from EE-06 to a depth of 2 feet. EE-07 targeted the removal of hazardous waste-contaminated area. Approximately 91 cubic yards of soil were removed from EE-07 to a depth of 2 feet. Approximately 30,000 tons of asbestos-containing materials were stored on this site as of the survey conducted 1997. The Building 300 and 301 foundations are considered part of the durable cover for the Parcel C remedy. | PRC, 1994b; Tetra Tech, 1998; Innovative, 2004 |
| | IR-58 | IR Site 58; RA Completed | IR Site 58 is in the north-central portion of Parcel C, north of Buildings 251 and 258. It was a former scrap yard. During the 1993 SI, observations indicated piles of scrap metal, manufacturing equipment, abandoned automobiles, motors, scrap wood, office equipment, fire extinguishers, damaged lead-acid batteries, and leaking oil drums and leaking insulators. Two USTs used to contain gasoline and diesel fuel and solvent. The tanks have been removed. The foundations of Buildings 251 and 258 are considered part of the durable cover for the Parcel C remedy. | HLA, 1994 |
| | IR-63 | IR Site 63; RA Completed | IR Site 63 is also referred to as Former Building 278, which was used for paint storage. Samples collected during the Parcel C RI indicated that there was a potential for risk to future residents from metals in soil. The area is currently under durable covers. | |
| | IR-64 | IR Site 64; RA Completed | IR Site 64 is between Dry Docks 2 and 3. Building 206 was former substation A. | Tetra Tech, 1999; CE2-Kleinfelder, 2009; Tetra Tech, 1998 |
| | IR-16 | IR Site 16; Unknown | IR Site 16 is a 10,000-square-foot fenced area at the eastern corner of H Street and Mahan Street near the southern tip of Former HPNS. Previous activities on the site by Triple A allegedly included storage of drums, transformers, and some flammable solids, and the site included a 5,000-gallon tank. | HLA, 1989; Tetra Tech, 1998 |
| Parcel D-1 | IR-17 | IR Site 17; Unknown | IR Site 17 covers approximately 1.8 acres at the southern tip of Former HPNS, immediately east of the end of H Street. Triple A supposedly stored and disposed of drums at this site, and visible stains were reported on the ground. | HLA, 1989; Tetra Tech, 1998 |
| | IR-22 | IR Site 22; Unknown | IR Site 22 is in the northern portion of Parcel D-1. Associated Building 368 was part of the shop services group and was used as pipefitting shop. Building 369 was itemized as a rigging shop and was investigated as IR Site 22. Building 308 was used as a saltwater pump house. | PRC, 1994a; Tetra Tech, 1998; NAVSEA, 2004 |

1-23

1.0 INTRODUCTION

**Table 1-2. Installation Restoration Site Summary**

| Parcel | Site | Site Name and Status | Location, Description, and Site Background | Reference |
|---|---|---|---|---|
| | IR-32 | IR Site 32: Unknown | IR Site 32 is in the eastern portion of Parcel D, near the northeastern end of Mahan Street. The site is approximately 9.4 acres and included the Regunning Pier, which extends along Berths 15 and 16, and 370 and 383. Building 370 was a latrine and Building 383 was used by the Navy for shipping and receiving; it was later leased to Westinghouse for office and warehouse use. As of 2009, Building 383 was used a training center by local communities. A 450-ton crane was constructed on the Regunning Pier to remove gun turrets from Navy ships during World War II. Waste oils and electrolyte solutions containing metals, thinners, and lubricants associated with crane maintenance were identified at IR Site 32. Electrical equipment, switch boxes, and crane parts were stored on exposed soil adjacent to the northeastern end of Building 383, and containers of radioactive material were stored at the Regunning Pier from 1950 to 1959. | ChaduxTl, 2009; NAVSEA, 2004 |
| | IR-35 | IR Site 35; Cleanup Completed | IR Site 35 is immediately northwest of Building 274. Building 274 was used as an office and instrument hut for Poseidon. Building 306 was Substation I. Buildings 313 and 313A were used by the NRDL. Building 322 was former Marine Guard and Pass Office. Building 372 was used as the prefab decking shelter and was leased to Astoria Metals. Approximately 35,000 pounds of lead-based paint were stored in Building 372 in 1997. A surface spill was identified during investigations conducted from 1993 to 1996, and in 2000. In 2009, the Navy conducted supplemental sampling to support a request for petroleum closure/no further action. | PRC, 1994a; PRC, 1994b; Tetra Tech, 1998; NAVSEA, 2004 |
| | IR-48 | IR Site 48; Unknown | IR Site 48 is in the south-central portion of Parcel D and was a suspected subsurface steam line transporting waste oil from the docks and boilers on an AST (S-505) in Parcel E. The steam ran from Berth 15, along Manseau Street to Hussey Street, then approximately 350 feet south along the western side of Hussey Street, then west to H Street, and then south along H Street to a point between IR Site 38 and IR Site 39 where the line left Parcel D and entered Parcel E. The line termination was in the vicinity of Building 521 (Power Plant South Area) within Parcel E. | ChaduxTl, 2009; Tetra Tech, 1998 |
| Parcel D-1 | IR-53 | IR Site 53; Cleanup Completed | IR Site 53 included a former storehouse (Building 525) and the former automotive hobby shop (Building 530). Building 530 was also used for car washing. Buildings were leased to Hydro-Chemical Services, Inc., after Navy operations ceased. Investigation activities were performed in 1993, 1994, and 1996. Interim excavation activities were conducted in 1996 to remove TPH- and metals-affected soil. In 2009, the Navy conducted supplemental sampling to support a request for petroleum closure and no further action. | HLA, 1994; NAVSEA, 2004 |
| | IR-55 | IR Site 55; Unknown | IR Site 55 is in central portion of Parcel D-1. Building 307 was used as an electronic assembly facility and storage area. It was then leased to NIROP of Sunnyvale. | PRC, 1994a |
| | IR-68 | IR Site 68 (Poseidon Area); Cleanup Completed | IR Site 68 is on the pier surrounded by Berths 17, 18, and 19. Building 376 was used as Poseidon Control Hut. Building 378 was a latrine. Building 379 was a Poseidon Instrumentation Control Center. Building 382 was a Poseidon Arresting System Shelter. North of Building 378 was a diesel generator, generator shed, and two ASTs (10,000-gallon diesel fuel tank and 50-gallon tank probably for water or coolant), which were removed from 1993 to 1995. Investigations were performed in 1995, 1996, and 2001. | PRC, 1994b; Tetra Tech, 1998; HLA, 1994; NAVSEA, 2004 |
| | IR-69 | Bilge Water Pump House; Inactive | Building 523 was a saltwater pump house and the adjacent metal shed. The site is east of Building 530 adjacent to Berths 17, 18, and 19. It contained electrical equipment containing PCBs, pumps, pipes, and a floor vault. Identified as the bilge water pump house | Tetra Tech, 1998; Tetra Tech EM, 1998; HLA, 1994; NAVSEA, 2004 |
| | IR-70 | Former drum and tank storage area; Cleanup Completed | IR Site 70 included the former drum and tank storage area southeast of Building S-308. Building S-308 was a shed with a cyclone outside the southern wall, which was used for sandblasting operations. Building S-308 was also used as a playing field and facility. The following were reportedly located within the IR Site 70 before their removal: 160-gallon metal waste petrochemical tank, three 55-gallon drums supported by pallets, 130-gallon oil-filled container, 5-gallon container of organic liquid, and an iron depressurization tank. Impacted soils were excavated in August 1996. Supplemental investigation activities were performed in 2010 to support an evaluation of no further action for non-PFAS chemicals. Materials reportedly managed or disposed of in this area include bilge liquids and sandblasting debris. | Tetra Tech EM, 1998; HLA, 1994; NAVSEA, 2004 |
| Parcel G | IR-09 | Pickling and Plating Yard; RA Completed | IR Site 9 is in the central portion of the Former HPNS and is north of Building 411. Steel pickling and metal plating occurred at this site from 1947 to 1973. Building 421 was used as an oxygen control shop. Building 422 was used as an office and latrine. This area was investigated several times before the RA began. The results indicated that the liquid from the pickling tanks contained concentrations of chromium and copper, and the paint residue sample contained concentrations of chromium, lead, and zinc, SVOCs, and PAHs. During the remedial investigation conducted from 1988 to 1991, the primary contaminant observed in the soil and groundwater was hexavalent chromium. The RA was completed in 1996, including removal of the concrete foundations in the plate storage and drying rack area, removal of zinc residue and other wastes, and removal of pickling tanks. In August 2017, three groundwater monitoring wells were sampled, including two upgradient and one downgradient of potential source areas. The samples were analyzed for PFAS. The highest concentration of PFOS (0.0142 µg/L) was in downgradient monitoring well IR09P040A, and the highest concentration of PFOA (0.0119 µg/L) was in upgradient well IR08MW01A. All concentrations were less than the current Department of Defense screening criteria. The Building 411 foundation is considered part of the durable cover for the Parcel G remedy. | TriEco–Tt, 2013; IEJV, 2019; Westec, 1984; Tetra Tech, 1998; Trevet, 2018 |

**Table 1-2. Installation Restoration Site Summary**

| Parcel | Site | Site Name and Status | Location, Description, and Site Background | Reference |
|---|---|---|---|---|
| | IR-33 | IR Site 33; RA Completed | IR Site 33 is in the central portion of Parcel G. Building 411 was used as the shipfitter and boilermaker shop and later as a workshop, storage area, and office when leased to Christian Engineering. Buildings 302 and 303 were used as transportation shops, and Building 304 was used as a service station. Building 302 was later leased to the Golden Gate Railroad Museum and was used as a shop and for storage. Building 364 was initially used as an animal irradiation and research facility for isotope processing and decontamination studies and as a general research laboratory. It was later leased to a laboratory company that performed assay operations. Building 365 was a storage building, offices, and film lab. Building 417 was used for acetylene manifolding and welding. Building 418 was used as the Q&RA Welding and Engineering Facility and was used for metal spray. Building 424 was the former Area Time House No.4. Buildings 417, 418, and 424 were leased to Hydro Chem Services after Navy use and were used as storage, parking, offices, and a workshop. Buildings 419 and 420 were used for oxygen conversion and oxygen cylinder changing. Approximately 15 cubic yards of soil affected by a cesium-137 spill were removed from this site in 2001 and 2002. The foundations for Buildings 411, 302, 303, and 304 are considered part of the durable cover for the Parcel G remedy. | TriEco–Tt, 2013; Westec, 1984; PRC, 1994a; Tetra Tech, 2008a, Tetra Tech, 2008b; Tetra Tech, 1998; CH2MHill, 2019; NAVSEA, 2004 |
| | IR-34 | IR Site 34; RA Completed | IR Site 34 is in the eastern portion of Parcel G. Buildings 351 and 351A were used as an electronics shop and NRDL Electronics Laboratory. Cleaning and painting of electronic equipment, photographic reproduction, and photo developing occurred in these two buildings. Building 366 was used as a boat and plastic shop and was leased to Christian Engineering for workshop and storage use. It was also used for NRDL instrument calibration and as general laboratories, a chemical research lab, and a shipyard radiography shop. Ventilation ducting and a floor drain in Building 366 were the source of a release of cesium-137 at a concentration that exceeded action levels. The foundations for Buildings 351 and 366 are considered part of the durable cover for the Parcel G remedy. | Westec, 1984; PRC, 1994a; Tetra Tech, 1998; CH2MHill, 2019 |
| | IR-37 | IR Site 37; RA Completed | IR Site 37 is in the northwestern corner of Parcel G. Building 401 was used as a public workshop and was later leased as an artist studio. Building 423 was used as a compressor building until 1956 and was used for storage of paint and roofing materials afterwards. It was demolished as of 2004. Building 435 was used for equipment storage and for spray painting. Buildings 436 and 437 were used for storage. The foundation for Building 401 is considered part of the durable cover for the Parcel G remedy. | PRC, 1994a; Tetra Tech, 2006c; Tetra Tech, 1998; NAVSEA, 2004 |
| Parcel G | IR-44 | IR Site 44; RA Completed | IR Site 44 is on the southern boundary of Parcel G. Buildings 408, 409, and 410 were used as a heat-treating furnace shelter, welder motor facility, and generator huts, respectively. Building 438 was used as a metal spray shelter. The furnace was used as a kiln. The spray shelter was apparently used to clean and paint small metal parts. The generator motor apparently supplied power for the welding stations outside the building to the north and west. | PRC, 1994a; Tetra Tech, 2006c; Tetra Tech, 1998 |
| | IR-65 | IR Site 65; RA Completed | IR Site 65 is near the eastern boundary of Parcel G. The site includes Building 324, which was used as the carbon dioxide refilling station for fire extinguishers. IR Site 65 was part of Redevelopment Block 39 and part of DM 8866, where PCB- and arsenic-impacted soil was excavated. Investigations were conducted in 1995, 1996, and 2001. Surficial soil was found to be contaminated with petroleum hydrocarbons. In 2008, trenching and soil removal was conducted as part of the CERCLA Radiological Program Sanitary Sewer and Storm Drain Removal Project. | Navy BRAC, 2009a; Tetra Tech, 1998 |
| | IR-66 | IR Site 66; RA Completed | IR Site 66 is in the western portion of Parcel G. Building 407 was formerly used as storehouse and vehicle storage yard and was then leased to a sheet metal fabricator company and furniture storage company. The Building 407 foundation is considered part of the durable cover for the Parcel G remedy. | PRC, 1994a; Tetra Tech, 1998; HLA, 1994 |
| | IR-67 | IR Site 67; RA Completed | IR Site 67 is in the southwestern corner of Parcel G. Building 439 was previously used by the Navy as an equipment storage facility. The building contained an acid dip tank, alkaline dip tanks, and paint booths. The building was completed in 1974 by apparently never used by the Navy. It was leased from 1985 to 1990 to various tenants. The foundation for Building 439 is considered part of the durable cover for the Parcel G remedy. | HLA, 1994; NAVSEA, 2004 |
| | IR-71 | IR Site 71; RA Completed | IR Site 71 is in the southeastern corner of Parcel G. The Navy conducted a treatability study at Parcel G in 2008 to evaluate technologies to address COCs in groundwater and identified separate chloroform and PCE and TCE plumes. Groundwater monitoring results for the chloroform plume have been below remediation goals and generally below detection limits in recent sampling events. The PCE and TCE concentrations in the plume are higher than remediation goals but have been on a decreasing trend since about 2000. Groundwater zero-valent iron injection at the IR Site 71 western chloroform plume was completed in 2006. | TriEco–Tt, 2013; Westec, 1984; PRC, 1994a; NAVSEA, 2004 |
| | IR-02 Northwest and Central | Bay Fill; Open | IR-02 Northwest and Central are approximately 40 acres southwest of J Street. The site was used for disposal of industrial debris, drums, paint containers, asphalt, asbestos, sandblast waste, waste oil, and other unknown liquid waste. Building 800 is in this area and was used as a bachelor enlisted men's quarters from 1970 to 1984. | TriEco–Tt, 2013; Westec, 1984; PRC, 1994a; NAVSEA, 2004 |
| Parcel E | IR-02 Southeast | Burning Disposal Site, Open | IR Site 2 Southeast is the former burning disposal area in the southeastern corner of the Former HPNS. Approximately 11,200 cubic yards of soil, metal slag, and debris from the metal debris reef area were removed and disposed of offsite from 2005 to 2007. | TriEco–Tt, 2013; Westec, 1984 |

CH2M-D007-4930-0008

Table 1-2. Installation Restoration Site Summary

| Parcel | Site | Site Name and Status | Location, Description, and Site Background | Reference |
|--------|------|----------------------|--------------------------------------------|-----------|
| | IR-03 | Oil Reclamation Ponds, Open | IR Site 3 is on the southeastern shorelines of the Former HPNS within IR Site 2 Central. There were two oil reclamation ponds onsite. One pond was 50 feet by 60 feet and 5 feet deep with a capacity of 190,000 gallons, and the other was 55 feet by 100 feet and 5 feet deep with a capacity of 250,000 gallons. The ponds were unlined and constructed with bay fill material within 10 meters of the shoreline. In 1974, the ponds were emptied and filled with soil. A sheet, pile wall and cap were installed at the former oil reclamation ponds from 1996 to 1998, and a bench scale treatability study for NAPL was conducted onsite in 2011. | IEJV, 2019; TriEco-Tt, 2013; Westec, 1984; Tetra Tech, 1998 |
| | IR-04 | Scrap Yard, Open | IR Site 4 is east of the former industrial landfill site (Parcel-E2) in the southwestern portion of the Former HPNS. The site was a scrap yard and scrap material area where the Navy stored used submarine batteries, electrical capacitors, and steel. In 1976, the area was leased to Triple A, which also used it as a scrap yard. Drums, pipe lagging, batteries, liquid wastes, and scrap metal were found, and stained soil was observed at this site. Building 807 was within IR Site 4 and was used as the scrap yard shed. This building was demolished as of 2004. | Westec, 1984; Tetra Tech, 1998; Gilbane, 2016; NAVSEA, 2004 |
| | IR-05 | Old Transformer Storage Yard, Open | IR Site 5 was used as an electrical transformer storage yard starting in 1946. | Westec, 1984 |
| | IR-08 | PCB Spill Area, Open | IR Site 8 is on the boundary of Parcel E and Parcel D-1, southeast of Building 606. Building 606 was built in 1989 in an area formerly occupied by demolished Buildings 503, 507, and 508. Building 606 was used for Shore Intermediate Maintenance Activities. Former Building 503 was a barracks. Building 507 was a biological laboratory, and Building 508 was a health physics office. IR Site 8 was identified as a PCB spill area in September 1986 when PCB contamination was found during construction work near Building 503. The initial results showed PCB concentrations as high as 910 ppm in the soil. Approximately 1,550 cubic yards of soil contaminated by PCBs were removed in 1989 during construction of Building 606. | TriEco-Tt, 2013; Tetra Tech, 1998 |
| | IR-11 | Power Plant, Open | IR Site 11 is in the southeastern portion of the Former HPNS north of J Street. Building 521 on the site was a former power plant. | Westec, 1984 |
| | IR-12 | Disposal Trench and Salvage Yard; Open | IR Site 12 covers slightly more than 6 acres near the southwestern corner of HPNS, north of 6th Avenue and south of Spear Avenue. The area was used by both the Navy and Triple A as a salvage yard where equipment was stored for later reuse. A concrete slab on a portion of the site was reportedly used as a drum crushing pad. Metals, TPH, TRPH, PCBs, PAHs, and oil and grease were detected in groundwater samples at concentrations that exceeded the site screening criteria. Building 702 was a "scrap yard shed". Building and brush fires (Class A fires) are not typically extinguished with AFFF. AFFF is used for fuel fires to suppress flammable liquid vapor (Class C fires). | HLA, 1989; Tetra Tech, 1998; Tetra Tech EM, 1998 |
| | IR-13 | Former Commissary Site; Open | IR Site 13, the former commissary site, encompasses approximately 0.66 acre near the southern edge of the Former HPNS in the triangular area bounded by T Street on the east, J Street on the south, and the extension of Manseau Street on the northwest. During Triple A's occupancy, sandblasting waste, drums, and oily dirt were reportedly stored onsite. In addition, transformers possibly containing PCBs were stored on the eastern side of the site. | HLA, 1989 |
| | IR-14 | Oily Liquid Waste Disposal Area; Open | IR Site 14 comprises approximately 4.5 acres near the southern edge of the Former HPNS between H and I" Streets northwest of the power plant (Building 521). Oily liquid wastes were allegedly disposed of on the ground at IR Site 14, and drums, transformers, and chemical canisters were reportedly dumped onsite. VOCs and SVOCs were detected in soil samples. | HLA, 1989; Tetra Tech, 1998 |
| | IR-15 | IR Site 15; Open | IR Site 15 consists of two areas immediately adjacent to Building 521 near the southern tip of the Former HPNS. These areas, northeast and northwest of Building 521, comprise approximately 0.75 acre. Oily waste ponds and a tank used to incinerate wastes were allegedly present. Soil samples collected in 1987 contained VOCs and SVOCs. VOCs, SVOCs, petroleum hydrocarbons, oil, grease, and metals were detected in groundwater. | HLA, 1989 |
| Parcel E | IR-36 North | IR Site 36 North; Open | IR Site 36N is in the northern corner of Parcel E. Building 400 was used as Ships Operational Activity Parts Receiving Storehouse by Navy Planning and Engineering. Building 405 was used for storage (including transformers) and was later leased by a mushroom cultivation company after Navy use. Building 404 was formerly used as a supply storehouse. This building was then leased to Mina Metals and was used for metal products manufacturing. | PRC, 1994a; Tetra Tech, 1998 |
| | IR-36 West | IR Site 36 West; Open | IR Site 36W is west of IR Site 36S. The associated Building 371 was used for equipment storage. Building 704 was used as Transportation Shop and Car Shelter. Building 709 was used as a gas station. Seven former USTs are associated with Building 709. | PRC, 1994a; Tetra Tech, 1998 |
| | IR-36 South | IR Site 36 South; Open | IR Site 36S is south of IR Site 36N. Building 406 was used as storehouse for packing and preservation. Building 413 was a supply storehouse and Building 414 was a Public Works Furniture Storehouse. This site also contained vacant lots. | PRC, 1994a; Tetra Tech, 1998 |
| | IR-38 | IR Site 38; Open | IR Site 38 is in the central portion of Parcel E. Associated Building 500 was used as the Ships Bachelor Officers Quarters and Chief Petty Officer Barracks. Gasoline AST S-505 remained onsite as of 1994. | PRC, 1994a; Tetra Tech, 1998; NAVSEA, 2004 |

**Table 1-2. Installation Restoration Site Summary**

| Parcel | Site | Site Name and Status | Location, Description, and Site Background | Reference |
|---|---|---|---|---|
| Parcel E | IR-39 | IR Site 39; Open | IR Site 39 is in the central portion of Parcel E. The site consisted of two areas connected by IR Site 13, Building 505 was used as Navy Exchange, bowling alley, gymnasium, ships canteen, and NRDL Annex. Buildings 707 and 708 were used an NRDL animal colony and an NRDL biomedical facility. | PRC, 1994a; Tetra Tech, 1998; NAVSEA, 2004 |
| | IR-47 | Fuel Distribution Lines; Open. | Fuel was transported from Berth 29 in Parcel D to Building 521 and former AST S-505. Triple A is suspected of having used the fuel lines to transport waste oil from Berth 29 in Parcel D to Building 521, former AST S-505, and the former AST reclamation ponds (IR-03). The site will be addressed as part of the Parcel E remedy (excavation and offsite disposal). | Tri/Eco-Tt, 2013 |
| Parcel E-2 | IR-01/21 | Parcel E-2 Landfill; Open | Parcel E-2 (IR Sites 01 and 21) is in the southwestern corner of the Former HPNS and is within the south bay shore area. It was used as an industrial landfill site serving the entire shipyard. The wastes disposed of at Parcel E-2 included domestic garbage and refuse, bay dredge materials, building construction and demolition materials, industrial shop waste, waste containers, and low-level radioactive waste. Approximately 44,500 cubic yards of soil and debris from the PCB hot spot area in the southern portion of Parcel E-2 were removed and disposed of offsite during 2005 to 2007. The RA is currently under construction. | Tri/Eco-Tt, 2013 |
| | IR-52 | Railroad Right-of-Way; RA Completed | The railroad right-of-way portion (IR Site 52) of Parcel UC-3 is in the San Francisco Bayview neighborhood. The railroad was originally used to transport materials and equipment to and from the shipyard. The site was leased to Triple A in 1976. Stained soil, spilled paint, and household wastes were observed during previous investigations. The Crisp Road portion of Parcel UC-3 is adjacent to the northern boundary of the Former HPNS, and the western edge is adjacent to areas where the former Triple A had a scrapyard to store metal, drums, pipe lagging, liquid waste, and batteries. Triple A also had disposal trenches for waste liquids and a concrete pad for crushing waste liquid drums. The final ROD (2014) identified the selected remedy for Parcel UC-3 to address soil vapor and groundwater. Radiologically impacted sewer and storm drain lines within Parcel UC-3 were removed in 2012. RAs, including excavation of contaminated soil and construction of durable asphalt and a concrete cover, were conducted in 2016. | KCH, 2014; Aptim, 2017; Gilbane, 2016; Gilbane, 2018 |
| Parcel UC-3 | IR-45 | Basewide Steam Line System; RA Completed | A Basewide steam line system (IR Site 45) is on Parcels D-1, G, E, and UC-3. Triple A was suspected of using portions of the Basewide steam line system within Parcels D-1 and E to transport waste oil. Based on the findings of the previous site investigation, as detailed within the design basis report, the steam line within Parcel UC-3 does not pose a threat to soil or groundwater and no additional investigation or RA is necessary. | Tetra Tech, 1998 |
| | IR-56 | Former Train Depot; Open | IR Site 56 is on the northwestern corner of Parcel E. The site was formerly a train depot. Railroad tracks next to Building 809 remain onsite. Building 809 was formerly used as a lumber storage area and service station and was used as Railroad Museum after Navy use. Use of wood preservatives and railroad cleaning solvents was suspected, and evidence of paint leakage from storage containers was observed. Metals, TPH, PAHs, and PCBs were detected at concentrations exceeding the site screening levels in soil. | PRC, 1994a; Tetra Tech, 1998; Gilbane, 2016 |
| | IR-74 | IR Site 74; Transferred | IR Site 74 was a former NRDL facility of about 4.2 acres in the vicinity of Parcel A north of UC-3. Building 815 and associated land consist of approximately 4.3 acres. The property was transferred to Ted Lowepensky, a molding manufacturer, on December 12, 1984. The building was used as Naval Radiological Defense Laboratory. USTs associated with former gasoline station operating in the 1950s were identified within the footprint of Building 815. | PRC, 1995; PRC, 1997; Tetra Tech EM, 2004; NAVSEA, 2004 |

CH2M-D007-4930-0008

## Table 1-2. Installation Restoration Site Summary

Note:

Table adapted from the following reference: Multi-MAC Joint Venture (Multi-MAC JV). 2022. *Preliminary Assessment Report Basewide Investigation and/or Corrective Action at the Combined Site at Parcel B-2 and Parcel C, Hunters Point Naval Shipyard, San Francisco, California. June.*

References:

Amec Foster Wheeler Environment & Infrastructure, Inc. (AMEC). 2016. *Work Plan, Petroleum Hydrocarbon Investigation and/or Corrective Action at the Combined Site at Parcel B-2 and Parcel C, Hunters Point Naval Shipyard, San Francisco, California. June.*

Aptim. 2017. *Revised Draft Interim Remedial Action Completion Report, Parcel C Remedial Action.*

CE2-Kleinfelder Joint Venture. 2009. *Semiannual Groundwater Monitoring Report (Oct. 2008–March 2009). July 2009*

CH2M Hill Inc. 2019. *Final Parcel G Removal Site Evaluation Work Plan, Formers Hunters Point Naval Shipyard, San Francisco, California. June 2019.*

ChaduxTI. 2009. *Record of Decision for Parcels D-1 and UC–1 Hunters Point Shipyard San Francisco, California. July 24.*

Department of the Navy (Navy) BRAC. 2009a. *Final Record of Decision for Parcel G. February 18.*

Gibane. 2016. *Final Work Plan Remedial Action for Parcel UC–3.*

Gibane. 2018. *Final Remedial Action Completion Report (RACR) for Parcel UC–3.*

Harding Lawson (HLA). 1989. *Preliminary Assessment for Sites PA–12 through PA–18.*

HLA. 1994. *Final Site Assessment Report Potentially Contaminated Sites Parcel B, C, D, and E. April 15.*

Innovative Technical Solutions, Inc. (Innovative). 2004. *Final Work Plan Dry Dock 4 Water Sampling and Debris Removal, Hunters Point Shipyard, San Francisco, California. July 2004.*

Innovex and ERRG Joint Venture (IEJV). 2019. *Final Fourth Five-Year Review Hunters Point Naval Shipyard San Francisco, California*

KCH. 2014. *Final Record of Decision for Parcel UC–3.*

KMEA MACTEC JV (KMEA). 2017. *Work Plan for Parcel B-2 Installation Restoration site 26 Groundwater Treatment at Former Hunters Point Naval Shipyard San Francisco, California. June 2017.*

Naval Sea Systems Command (NAVSEA). 2004. *Historical Radiological Assessment, Hunters Point Annex, History of the Uses of General Radioactive Material 1939–2003. August.*

PRC. 1994a. *Base Realignment and Closure (BRAC) Cleanup Plan.*

PRC. 1994b. *Final Site Assessment Report Potentially Contaminated Sites Parcel B, C, D, and E. April 15.*

PRC. 1994c. *Draft Summary Report of Phase I and Phase II Underground Storage Tank Removals and Closures in Place, Naval Station Treasure Island, Hunters Point Annex, San Francisco, California. July 12.*

PRC. 1995. *Formerly Used Defense Sites (FUDS) Field Sampling Plan. December 22.*

PRC. 1997. *BRAC Cleanup Plan Revision 3 Hunters Point Shipyard. February 21.*

Tetra Tech. 1998a. *Final Basewide finding of Suitability to Lease (FOSL), Excluding Parcel A. March 1*

Tetra Tech. 1998b. *Final Basewide Environmental Baseline Survey, Revision 01, Hunters Point Shipyard, San Francisco, California. September.*

Tetra Tech. 1999. *Parcel C Risk Management Review Technical Memorandum Hunters Point Shipyard San Francisco, California. November 1.*

Tetra Tech. 2006. *Final Demolition Work Plan, Building 144, HPNS.*

Tetra Tech. 2008a. *Demolition Work Plan, Building 364, HPNS.*

Tetra Tech. 2008b. *Demolition Work Plan, Building 365, HPNS.*

Tetra Tech. 2008b. *Demolition Work Plan, Building 408, HPNS.*

Tetra Tech EM. 2004. *Final Finding of Suitability to Transfer for Parcel A (Revision 3) Hunters Point Shipyard, San Francisco, California. October 14, 2004.*

Trevet. 2017. *Final Maintenance and Monitoring Approach Sampling and Analysis Plan for Basewide Groundwater Monitoring Program, Hunters Point Naval Shipyard, San Francisco, California. April 2017.*

TriEco-Ti. 2013. *Final Third Five-Year Review of Remedial Actions Hunters Point Naval Shipyard San Francisco, California.*

WESTEC Services Inc. (Westec). 1984. *Initial Assessment Study at Hunters Point Naval Shipyard.*

µg/L = microgram(s) per liter

AFFF = aqueous film-forming foam

AOC = Area of Concern

AST = aboveground storage tank

bgs = below ground surface

CERCLA = Comprehensive Environmental Response, Compensation, and Liability Act

COC = chemical of concern

EE = exploratory excavation

HPNS = Hunters Point Naval Shipyard

IR = Installation Restoration

Navy = Department of the Navy

NAPL = Nonaqueous phase liquid

NIROP = Naval Industrial Reserve Ordnance Plant

NRDL = Naval Radiological Defense Laboratory

PAH = polycyclic aromatic hydrocarbon

PCB = polychlorinated biphenyl

PCE = tetrachloroethene

PFAS = per- and polyfluoroalkyl substances

PFBS = perfluorobutanesulfonic acid

PFOA = perfluorooctanoic acid

PFOS = perfluorooctane sulfonate

RA = remedial action

RI = Remedial Investigation

ROD = Record of Decision

SI = Site Inspection

SVOC = semivolatile organic compound

TPH = total petroleum hydrocarbons

TRPH = total recoverable petroleum hydrocarbons

TCE = trichloroethene

TCRA = time-critical removal action

UST = underground storage tank

VOC = volatile organic compound

1-28

## Table 1-3. Institutional Controls Summary

| Institutional Control | Performance Objectives | IR-07/18 | B-1 | B-2 | C | UC-2 | D-1 | UC-1 | G | E | E-2 | UC-3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARIC for Soil and Groundwater Use: General | Restricted activities must be conducted in accordance with the Covenant(s) to Restrict Use of Property, Quitclaim Deed(s), O&M Plan(s), LUC RD Report, Parcel-specific RMP(s), and, if required, any other work plan or document approved in accordance with these referenced documents: <br> a. "Land disturbing activity" includes, but is not limited to, the following: (1) excavation of soil, (2) construction of roads, utilities, facilities, structures, and appurtenances of any kind, (3) demolition or removal of "hardscape" (for example, concrete roadways, parking lots, foundations, and sidewalks), (4) any activity that involves movement of soil to the surface from below the surface of the land, and (5) any other activity that causes or facilitates the movement of known contaminated groundwater. <br> b. Alteration, disturbance, or removal of any component of a response or cleanup action (including but not limited to pump-and-treat facilities, revetment walls and shoreline protection, and soil cap/containment systems); groundwater extraction, injection, and monitoring wells and associated piping and equipment; or associated utilities. <br> c. Extraction of groundwater and installation of new groundwater wells. <br> d. Removal of or damage to security features (for example, locks on monitoring wells, survey monuments, fencing, signs, or monitoring equipment and associated pipelines and appurtenances). <br><br> Prohibited Activities: <br> a. Growing vegetables, fruits, or any edible items in native soil for human consumption.[a] <br> b. Use of groundwater. | ● | ● | ● | ● | ● | ● | ● | ● | ● |  | ● |
| Restrictions Related to VOC Vapors | Any proposed construction of enclosed structures must be approved in accordance with the Covenant(s) to Restrict Use of the Property, Quitclaim Deed(s), LUC RD, and RMPs before conducting such activity within the ARIC for VOC vapors to ensure that the risks of potential exposures to VOC (and SVOC, as applicable) vapors are reduced to acceptable levels that are adequately protective of human health. The reduction in potential risk can be achieved through engineering controls or other design alternatives that meet the specifications set forth in the Amended ROD, RD Reports, LUC RD Report, and RMPs. The ARIC for VOC (and SVOC, as applicable) vapors may be modified by the FFA signatories (and CDPH as applicable), as the soil contamination areas and groundwater contaminant plumes that are producing unacceptable vapor inhalation risks are reduced over time or in response to further soil, vapor, and groundwater sampling and analysis for VOCs that establishes that areas now included in the ARIC for VOC vapors do not pose an unacceptable potential exposure risk to VOC vapors. | ⊙ |  |  | ⊙ | ⊙ | ⊙ | ⊙ | ⊙ |  |  | ⊙ |
| ARIC for Soil and Groundwater Use: Within Areas Designated for Open Space, Educational/ Cultural, and/or Industrial Reuse (Figure 1-3) | Use restricted unless prior written approval for other uses is granted by the FFA signatories and CDPH (as applicable). In addition, the following land uses are specifically prohibited within the ARIC for radionuclides unless prior written approval for these uses is granted by the FFA signatories and CDPH (as applicable): <br> a. A residence, including any mobile home or factory-built housing, constructed or installed for use as residential human habitation <br> b. A hospital for humans <br> c. A school for persons under 21 years of age <br> d. A daycare facility for children <br> e. Any permanently occupied human habitation, including those used for commercial or industrial purposes. | ⊙ |  |  | ⊙ | ⊙ | ● | ⊙ | ⊙ |  |  | ⊙ |
| Radiologically Impacted Soil and Structures | For land-disturbing activities, as defined previously and including installation of water lines, storm drains, or sanitary sewers, above the demarcation layer, the LUC RD Report, O&M Plan, RMP, or a project-specific work plan, if applicable, will list the procedures for ensuring that the cap is not disturbed or breached. The specific design of the cap and clean soil cover will be agreed to in the RD. <br><br> The installation of water or sewer lines below the demarcation layer will be prohibited unless written approval is granted by the FFA signatories and CDPH. <br><br> Excavation into soils within the ARIC for radionuclides beneath the demarcation layer is strictly prohibited unless approved in writing by the FFA signatories and CDPH (as applicable). Any proposed excavation will be required to be described in a work plan that will include, but not be limited to, a radiological work plan, the identification of a radiological safety specialist, a soil management plan, soil sampling and analysis requirements, and a plan for offsite disposal of any excavated radionuclides by the transferee in accordance with federal and state law. The integrity of the cover/cap must be restored upon completion of excavation as provided in the O&M Plan(s), LUC RD Report(s), or similar document. | ⊙ |  |  |  |  |  |  |  | ⊙ | ● |  |

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

1.0 INTRODUCTION

**Table 1-3. Institutional Controls Summary**

| Institutional Control | Performance Objectives | IR-07/18 | B-1 | B-2 | C | UC-2 | D-1 | UC-1 | G | E | E-2 | UC-3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Parcels | | | | |
| Landfill Gas | Any proposed construction of enclosed structures must be approved in accordance with the Covenant to Restrict Use of the Property, Quitclaim Deed(s), LUC RD Report, and, if deemed necessary, the Parcel E-2 RMP before conducting such activities within the ARIC to ensure compliance with the substantive provisions of Cal. Code Regs. tit. 27 § 21190(a), (b), (d), (e), (f), and (g), which require that post-closure land uses be designed and maintained to protect health and safety in areas affected by landfill gas migration. In particular, Cal. Code Regs. tit. 27 § 21190(g) specifies design and construction standards for "all on site construction within 1,000 feet of the boundary of any disposal area." | | | | | | | | | | ● | |

[a] For Parcel E. Plants for human consumption may be grown if they are planted in raised beds (above the CERCLA-approved cover) containing non-native soil. Trees producing edible fruit (including trees producing edible nuts) may also be planted provided they are grown in containers with a bottom that prevents the roots from penetrating the native soil.

● = Applies to entire parcel
◑ = Applies to a portion of the parcel
ARIC = area requiring institutional control
Cal. Code Regs. = California Code of Regulations
CDPH = California Department of Public Health
CERCLA = Comprehensive Environmental Response, Compensation, and Liability Act
FFA = Federal Facilities Agreement
LUC RD = Land Use Control Remedial Design
O&M = operations and maintenance
RD = Remedial Design
ROD = Record of Decision
RMP = Risk Management Plan
SVOC = semivolatile organic compound
VOC = volatile organic compound

1-30

CH2M-O007-4930-0008

## Table 1-4. Air Monitoring Summary

| Parcel | Work | Timeframe | Findings | Reference |
|---|---|---|---|---|
| B | Radiological Retesting | July 2022 to August 2023 | On May 11, 2023, radium-226 exceeded project-specific action levels at one sample location that was later determined to be a false positive and was then categorized as a nondetect. | GES-ASRC Industrial, 2023a |
| C | Radiological Retesting | December 2022 to October 2023 | On July 6, 2023, PM10 was reported in one downgradient filter sample exceeding the DTSC HERO action level (50 µg/m³) but not the California OSHA PEL of 5,000 µg/m³. Real-time monitoring results were below the DTSC HERO action level. Additionally, a thorium-232 sample from the same filter exceeded the project-specific action level.<br><br>A safety standdown was held on August 17, 2023, to address the matter. Operations were reevaluated to reduce the presence of visible dust. The contractor continued to maintain persistent dust control measures. | GES-ASRC Industrial, 2023b |
| G | Radiological Retesting | August 2020 to May 2023 | Throughout site activities, there were several exceedances of the DTSC HERO action level for PM10 on filter samples. Real-time dust monitoring results for the same time periods were consistently below the DTSC action level and most of the exceedances were attributed to regional poor air quality from fires or smog unrelated to the site activities (for example, the Bay Area Air Quality Management District issued "spare the air" advisories for particulate matter on the same days where exceedances were reported).<br><br>On December 21 and 22, 2020, thorium-232 exceedances were reported but determined to be related to naturally occurring radioactive material. | Aptim, 2023a |
| E | Phase 1 Remedial Action | November 2019 to March 2023 | In April 2021 and June 2021, there were no earthmoving activities; however, asbestos samples slightly exceeded the action level. The lab sampling method does not differentiate between asbestos and other fibers. Retesting using the National Institute for Occupational Safety and Health Method 7402 can differentiate between fiber types, which indicated that the asbestos fiber concentration was below the action level.<br><br>On March 20, 2023, the total suspended particulates downwind filter-based sample result exceeded the action level. All other sampling results were below action levels. | Aptim, 2023b |

## Table 1-4. Air Monitoring Summary

| Parcel | Work | Timeframe | Findings | Reference |
|---|---|---|---|---|
| E | Phase 2 Remedial Action | December 2022 to June 2023 | No exceedances of project-specific action levels were reported. | GES-ASRC Industrial, 2023c, 2023d, 2023e |
| E-2 | Phase 3 Remedial Action | March 2022 to March 2023 | No exceedances of project-specific action levels were reported. | KEMRON, 2022, 2023 |

References:

Aptim. 2023a. *Air Sampling Summary Report No. 016. Data Date Range: August 24, 2020 through May 11, 2023 Parcel G. Former Hunters Point Naval Shipyard, San Francisco, California. July.*

Aptim. 2023b. *Air Sampling Summary Report No. 37, Data Date Range: November 20, 2019 through March 30, 2023 Parcel E Remedial Action - Phase 1. Hunters Point Naval Shipyard, San Francisco, CA. July.*

GES-ASRC Industrial. 2023a. *Air Monitoring Summary Report 09 For Parcel B Removal Site Evaluation, Hunters Point Naval Shipyard, San Francisco, California. July 7th, 2022 through August 20th, 2023.*

GES-ASRC Industrial. 2023b. *Air Monitoring Summary Report for Parcel C Radiological Confirmation Sampling and Survey, Hunters Point Naval Shipyard, San Francisco, California. December 5th, 2022 through October 19th, 2023.*

GES-ASRC Industrial. 2023c. *Air Monitoring Summary Report for Parcel E Remedial Action Phase 2, Hunters Point Naval Shipyard, San Francisco, California. December 1st, 2022 through March 1st, 2023.*

GES-ASRC Industrial. 2023d. *Air Monitoring Summary Report for Parcel E Remedial Action Phase 2, Hunters Point Naval Shipyard, San Francisco, California. May 1st, 2023 through May 31st, 2023.*

GES-ASRC Industrial. 2023e. *Air Monitoring Summary Report for Parcel E Remedial Action Phase 2, Hunters Point Naval Shipyard, San Francisco, California. June 1st, 2023 through June 31st, 2023.*

KEMRON Environmental Services, Inc. (KEMRON). 2021. *Air Monitoring Summary Report August-September 2021, Remedial Action Parcel E-2, Phase III, Hunters Point Naval Shipyard, San Francisco, California. November.*

KEMRON. 2022. *Air Monitoring Summary Report March-April 2022, Remedial Action Parcel E-2, Phase III, Hunters Point Naval Shipyard, San Francisco, California. June.*

KEMRON. 2023. *Air Monitoring Summary Report August-December 2022, Remedial Action Parcel E-2, Phase III, Hunters Point Naval Shipyard, San Francisco, California. February.*

µg/m³ = microgram(s) per cubic meter
OSHA = Occupational Safety and Health Administration
DTSC = California Department of Toxic Substances Control
HERO = Human and Ecological Risk Office
PEL = permissible exposure limit
PM10 = particulate matter larger than 10 microns in size



Base Overview Figure/Parcel Map

**Fifth Five-Year Review Report**
**Hunters Point Naval Shipyard, San Francisco, California**

**Figure 1-1**

LEGEND
- Hunters Point Naval Shipyard Boundary
- Parcel Boundary
- Parcel F (Water) Boundary
- Former Navy Property
- Non-Navy Property
- Water
- Building
- Road

NOTES:
IMAGERY SOURCE:
ESRI ArcGIS Online Web Service,
World Street Map

0    1,400
Feet
1 inch = 1,400 feet

N

This page intentionally left blank.



Installation Restoration Sites

**Fifth Five-Year Review Report**
**Hunters Point Naval Shipyard, San Francisco, California**

**Figure 1-2**

NOTES:
IMAGERY SOURCE:
ESRI ArcGIS Online Web Service,
World Street Map

0    1,400
Feet
1 inch = 1,400 feet

LEGEND

- Hunters Point Naval Shipyard Boundary
- IRP Site
- Parcel Boundary
- Parcel F (Water) Boundary
- Former Navy Property
- Non-Navy Property
- Water
- Building
- Road

This page intentionally left blank.



Figure 1-3

Land Use Districts

Fifth Five-Year Review Report
Hunters Point Naval Shipyard, San Francisco, California

The Redevelopment Plan was updated in 2018. The Land Use Districts shown on this figure were applicable at the time when risk evaluations and the development of institutional controls for future use were completed and may not be reflective of the current 2018 Redevelopment Plan.

NOTES:
IMAGERY SOURCE:
ESRI ArcGIS Online Web Service, World Street Map

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

1.0 INTRODUCTION

This page intentionally left blank.

CH2M-0007-4930-0008



Institutional Controls

**Fifth Five-Year Review Report**
**Hunters Point Naval Shipyard, San Francisco, California**

**Figure 1-4**

This page intentionally left blank.



Basewide Radiological Time-Critical
Removal Action Survey Trenches

**Fifth Five-Year Review Report**
**Hunters Point Naval Shipyard, San Francisco, California**

**Figure 1-5**

NOTES:
IMAGERY SOURCE:
ESRI ArcGIS Online Web Service,
World Street Map

0        1,400
Feet

1 inch = 1,400 feet

**LEGEND**
- Hunters Point Naval Shipyard Boundary
- Parcel Boundary
- Parcel F (Water) Boundary
- Radiological Survey Unit Trenches
- Former Navy Property
- Non-Navy Property
- Water
- Building
- Road

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

1.0 INTRODUCTION

This page intentionally left blank.

CH2M-0007-4930-0008

# 2.0    Five-Year Review Process

This section describes the Five-Year Review process for the sites at HPNS. This process includes conducting interviews and visual site inspections, reviewing all relevant documents, and notifying and presenting the findings to the community to keep the public informed of the progress to evaluate remedy effectiveness.

## 2.1    Site Interviews

The following individuals were interviewed via email in February 2023:

- Project Manager, KEMRON – Parcel E-2 Construction Contractor

- Project Manager, GES-AIS – Parcels B-1, B-2, C, D-1, D-2, UC-1, UC-2, and UC-3 Radiological Rework Contractor, Parcel E Construction Contractor

- Caretaker Site Office Facility/Compliance Project Manager

**Appendix B** provides the survey and consolidated responses. Overall, there were no issues identified.

## 2.2    Site Inspections

The Five-Year Review inspection was conducted on February 9, 2023. Applicable site sections summarize specific findings, and **Appendix C** provides inspection forms and photograph logs. Overall, the remedies were in good condition. Active work is being conducted at Parcels B-1, B-2, C, D-1, G, E, and E-2. An additional site inspection was conducted on January 23, 2024, with representatives from USEPA, DTSC, Regional Water Board, and the City of San Francisco OCII.

## 2.3    Document and Data Review

The Five-Year Review included a review of site-specific documentation for each site. First, the ROD, or post-ROD decision document if applicable, for each site was reviewed to identify the potential risks to human health and the environment that are the basis for taking RA, Remedial Action Objectives (RAOs), selected remedies, and ARARs. Additional review of relevant documents, including O&M records, monitoring data, and other pertinent documents and data, was also completed to assess remedy performance and continued protection of human health and the environment. Documents reviewed for each site are listed in their respective reference section.

Copies of Administrative Record documents are available by searching the online Administrative Record located on the HPNS public website at:

https://www.bracpmo.navy.mil/BRAC-Bases/California/Former-Naval-Shipyard-Hunters-Point/.

## 2.4    Technical Assessment

Information from the document and data review was used to answer three technical assessment questions from USEPA guidance. The type of information used for each question is discussed in this section.

**Question A: Is the remedy functioning as intended by the decision documents?**

The following information was used to address this question: decision documents, remedy performance monitoring data, long-term monitoring (LTM) or monitored natural attenuation (MNA) data, O&M reports, and IC inspection findings in comparison with the RAOs.

**Question B: Are the exposure assumptions, toxicity data, cleanup levels, and RAOs used at the time of the remedy selection still valid?**

The following information was used to address this question:

***Exposure Assumptions:*** Reviewed chemicals of emerging concern, new pathways of concern, and changes in land use.

***Toxicity Data:*** Reviewed the toxicity information and values for COCs and ROCs to evaluate whether the conclusions from the previous HHRAs and ecological risk assessments (ERAs) are still valid.

***Cleanup Levels:*** Reviewed current ARARs and standards on which the ROD cleanup levels are based.

***RAOs:*** Reviewed existing RAOs in context with the other components of Question B to determine whether the remedy will meet the existing RAOs.

**Question C: Has any other information come to light that could call into question the protectiveness of the remedy?**

Information used to answer this question includes external factors that were not apparent during remedy selection and were not covered under Questions A and B, such as resilience to climate change.

## 2.5    Community Notification and Involvement

Members of the community were notified of the initiation of the Fifth Five-Year Review on February 15, 2023, via an announcement in the *San Francisco Chronicle* (**Appendix D**). When the Five-Year Review has been finalized, a notice will be sent to the newspaper indicating the results and that the final report is available to the public.

The Navy conducts outreach to members of the community with the objective to reach stakeholders, share program information, and receive community input. The Navy published an update to the Community Involvement Plan in November 2022 (Navy, 2022) that describes the surrounding community demographics and key stakeholders, current and planned outreach methods, and metrics for measuring outreach efforts. The outreach program consists of community meetings, presentations to local groups, updates to elected officials, small group site tours and stakeholder meetings, guided bus tours, local community events, and community technical assistance where experts in the field answer health and safety questions at meetings and events by phone or by email. Newsletters are provided to individuals and groups who subscribe, are posted to the HPNS public website (www.bracpmo.navy.mil/hpns), and key documents are maintained at the following local information repository:

**San Francisco Main Public Library**
Government Information Center, 5th Floor
100 Larkin Street
San Francisco, CA 94102
(415) 557-4500

The following community engagement and opportunities for stakeholder feedback on this fifth Five-Year Review were provided by the Navy:

- Meetings with agencies and San Francisco Department of Public Health to review parcel-specific findings and receive preliminary comments and feedback (5 biweekly 2-hour long meetings in February, March, and April)

- Providing the Draft Five-Year Review for public inspection and comment from February 7, 2024, to May 7, 2024

- Public outreach to notify the community about the CRA and Five-Year Review:

  - 1/22/24 – Navy presentation to Hunters Point Shipyard Citizens Advisory Committee

  - 2/26/24 – Email to Parcel A homeowner and resident points of contact for posting

  - 2/29/24 – Mailer to approximately 17,000 addresses

  - 3/1/24 – Outgoing informational message on HPNS Info Line

  - 3/1/24 – Mailer to approximately 90 community groups and organizations

  - 3/8/24 – Email to Parcel A homeowner and resident points of contact

  - 3/25/24 – Navy presentation to Hunters Point Shipyard Citizens Advisory Committee

  - 3/26/24 – Electronic newsletter to approximately 1,300 addresses

  - 4/11/24 – Email to Parcel A homeowner/resident points of contact

  - 3/18/24 – Electronic newsletter to approximately 1,280 addresses

  - Various meetings and discussions between the BRAC Environmental Coordinator and Shipyard Trust for the Arts members

  - Meeting announcement and materials on BRAC website

  - 4/1/24 – Outgoing information message on HPNS Info Line

  - 4/17/24 – Electronic newsletter to approximately 1,300 addresses

  - 4/22/24 – CRA Workshop (posterboards, presentation, and a question-and-answer session)

  - 4/27/24 to 4/28/24 – HPNS Bus Tours and information provided and questions answered about Five-Year Review and CRA (as appropriate with discussions)

  - 4/29/24 – Navy presentation to San Francisco Shipyard (Parcel A) homeowners and residents; CRA workshop slide deck was included in presentation materials

## 2.6    Next Five-Year Review

Per USEPA and Navy guidance, the next Five-Year Review is due to be finalized within 5 years from the signature of this Five-Year Review.

## 2.7    References

Department of the Navy (Navy). 2022. *Community Involvement Plan, Hunters Point Naval Shipyard, San Francisco, California.* Department of the Navy Base Realignment and Closure Program Management Office West. November.

CH2M-0007-4930-0008

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA

2.0 FIVE-YEAR REVIEW PROCESS

This page intentionally left blank.

CH2M-0007-4930-0008

# 3.0    Former Parcel B (Installation Restoration Sites 07 and 18, Parcels B-1 and B-2)

## 3.1    Site History and Background

Former Parcel B was formerly part of the industrial support area at HPNS and was used for shipping, ship repair, training, barracks, and offices. Activities supporting these uses, such as painting, metalworking, and storing, using, and disposing of liquids and fuels, are potential sources of chemicals (Navy, 2009).

Former Parcel B is bounded by Parcels A and C to the south, the City of San Francisco Bayview-Hunters Point District to the west, and Parcel F and San Francisco Bay to the north and east. The boundary between Parcel B and Parcel F is considered the mean lower low water line. Any base infrastructure at Parcel B that is considered to be "hanging" off seawalls and quay walls into the bay, such as piers, wharves, and dry dock sidewalls, is considered to be part of Parcel F.

Former Parcel B covers approximately 63 acres, which has been subdivided into two independent IR sites, IR-07 and IR-18 (referred to as IR-07/18) (14 acres) and Parcels B-1 (27 acres) and B-2 (22 acres) (**Figure 3-1**). IR-07/18 was split from Parcel B in 2008 to expedite remedy completion and transfer of the sites (Navy, 2019). In 2013, following the issuance of the Third Five-Year Review Report, the Navy subdivided Parcel B, excluding IR-07/18, into two separate parcels (Parcels B-1 and B-2) to accommodate varying property transfer schedules for different portions of the original parcel (ERRG, 2017).

The following IR sites are located in Former Parcel B:

- IR-07/18
- Parcel B-1: IR-10, IR-20, IR-23, IR-24, IR-42, IR-60, IR-61, and IR-62
- Parcel B-2: portions of IR-24, and IR-26

Facility-wide sites IR-50 and IR-51 also traverse the parcels. Active remediation is ongoing at IR-10 and IR-26. Investigations and actions began in 1994, as shown in the following chronology.

| Parcel B Chronology | |
|---|---|
| **Date** | **Investigation/Action** |
| 1994 | SI |
| 1996 | RI and FS |
| 1996 | Removal Actions at IR-23, IR-26, and IR-50 (Sediment in Parcel B Storm Drains) |
| 10/7/1997 | ROD |
| 1998 | Explanation of Significant Differences (ESD) |
| 1998–1999 | RA (Phase 1) |
| 2000 | ESD (Second) |
| 2000–2001 | RA (Phase 2) |
| 2001 | Quarterly Groundwater Monitoring |
| 2000–2002 | Soil Vapor Extraction (SVE) Treatability Study at IR-10 |

| *Parcel B Chronology* | |
|---|---|
| **Date** | **Investigation/Action** |
| 2003 | Investigation of Chromium VI in IR-10 Groundwater<br>Characterization and Sampling of Shoreline at IR-07 and IR-26<br>First Five-Year Review |
| 2004 | Historical Radiological Assessment (HRA) |
| 2003–2004 | Waste Consolidation and Removal Activities<br>Groundwater Treatability Study at IR-10 |
| 2004–Ongoing | Groundwater LTM |
| 2005 | Soil Gas Survey at IR-07/18 |
| 2006 | Phase III SVE Treatability Study at IR-10 |
| 2007 | Technical Memorandum in Support of a ROD Amendment |
| 2006–2010 | Radiological Removal Actions |
| 2008 | TCRA for Methane at IR-07<br>TCRA for Mercury at IR-26<br>Second Five-Year Review |
| 1/26/2009 | Amended ROD |
| 2010 | LUC RD – IR-07/18 |
| 2010–2012 | RD and Amendments |
| 2010–2011 | Construction of IR-07/18 Remedy<br>Hotspot Removal (Parcels B-1 and B-2) |
| 2011 | LUC RD Parcel B, Excluding IR-07/18<br>Remedial Action Completion Report (RACR) for Hotspot Excavation at Parcel B (B-1 and B-2) |
| 2011–Ongoing | O&M of Durable Covers and ICs (IR-07/18) |
| 2012 | RACR for IR-07/18 |
| 2012–2015 | Durable Cover Installation (Parcels B-1 and B-2) |
| 2013 | Biological Amendment Injection at IR-10<br>Third Five-Year Review |
| 2013–2020 | SVE at IR-10 (Parcel B-1) |
| 2015–Ongoing | O&M of Durable Covers and ICs (Parcels B-1 and B-2) |
| 2017 | In Situ Stabilization (ISS) Using Organo-sulfur Injections at IR-26 (Parcel B-2)<br>RACR for Durable Covers at Parcel B-1 |
| 2018 | RACR for Durable Covers at Parcel B-2 |
| 2019 | Fourth Five-Year Review for HPNS |

## 3.2    Site Characterization

This section summarizes the findings from various investigations at Former Parcel B that are pertinent to the Five-Year Review.

### 3.2.1    Physical Characteristics

#### 3.2.1.1    Surface Features

Parcel B is located in the lowlands portion of HPNS, and ground surface elevations range from 0 to 18 feet above msl (Navy, 1997). The elevation at IR-07/18 ranges from approximately 14 to 50 feet above msl. About 75 percent of the ground surface at Parcel B is covered by pavement and buildings; the western portion (IR-07/18) is unpaved and without structures. There is no surface water on Parcel B. Stormwater at Parcel B is currently handled via surface swales and storm sewers. The shoreline at Parcel B includes a mix of sandy beach and riprap, concrete and wooden seawalls, and riprap and concrete seawalls (Navy, 2009). The shoreline at IR-07 and portions of Parcels B-1 and B-2 are also covered by shoreline protection materials consisting of engineered riprap (ERRG, 2012a, 2017; Innovex-ERRG Joint Venture, 2018b).

#### 3.2.1.2    Geology and Hydrogeology

Parcel B was constructed in the 1940s by placing borrowed fill material from various sources, including crushed serpentinite bedrock from the adjacent highlands and dredged sediments (ChaduxTt, 2011a).

The following is a summary of hydrostratigraphic units at Parcel B:

- A-Aquifer: The A-aquifer generally thickens from about 15 feet in the southwest to as much as 80 feet in the northeast, but averages about 25 feet thick over most of Parcel B. In general, groundwater flows north/northeast, toward San Francisco Bay, approximately perpendicular to the shoreline (Navy, 2009). The tidal influence zone extends inland up to about 300 feet from the shoreline (PRC et al., 1996; PRC, 1996). Tidal influence may also mix groundwater with San Francisco Bay water; however, mixing usually does not occur as far inland as the fluctuations in groundwater elevation do (Navy, 2009). Depth to groundwater averages at approximately 8 feet below ground surface (bgs) (KMJV, 2021).

- Bay Mud: The Bay Mud is present over most of Parcel B; however, the Bay Mud is absent in some areas in the western and central portions of the parcel, and the A- and B-aquifers directly contact each other in those areas. Hydraulic communication is restricted, although not prevented, in areas where Bay Mud Deposits are present, and the potential for communication between the A- and B-aquifers is greater where the Bay Mud Deposits are absent. However, previous investigations (Tetra Tech, 2001) concluded that, although lithologic data suggest the potential for communication, chemical results do not indicate communication exists. The eastern portion of Parcel B that includes the peninsula called Point Avisadero is characterized by a thin layer of Artificial Fill over bedrock (Navy, 2009). The Bay Mud Deposits generally thicken from where they pinch out against the historical shoreline in the southwest to 40 feet near the bay margin in the northeast. Dredging has removed the Bay Mud and B-aquifer at various locations across Parcel B (Insight-ESI, 2023).

- B-Aquifer: The B-aquifer is not continuous across Parcel B but exists primarily in two separate areas, along the western parcel boundary and in a portion of the central area of the parcel. The semiconfined B-aquifer includes interbedded sands and clayey silts and ranges in thickness from about 5 to 15 feet where it is present and averages 10 feet thick

(Insight-ESI, 2023). In general, groundwater flows north/northeast toward San Francisco Bay. The groundwater elevation averages at approximately 6 feet above msl (TRWB, 2022).

## 3.2.2   Land Use

### 3.2.2.1  Current Land Use

Parcel B is owned by the federal government and is under the jurisdiction of the Navy. Most of the buildings at Parcel B are vacant, although a small number are used for commercial enterprises such as artist studios (Building 103, 104, 116, 117, and 125). Except for the few occupied buildings, Parcel B is unoccupied and unused. Most of Parcel B is fenced, and access is limited (Navy, 2009).

### 3.2.2.2  Future Land Use

Parcel B is currently planned to be transferred to the City and County of San Francisco. Based on the City and County of San Francisco's reuse plan as currently amended (SFRA, 1997; OCII, 2018), Parcel B land uses will include residential, institutional, retail sales and services, civic, arts and entertainment, parks and recreation, and office uses. The land use at IR-07/18 will be limited to parks and open space.

## 3.2.3   Basis for Taking Action

This section describes the results of site investigations and risk assessments that provide the basis for taking action at Parcel B. Details are provided in the RI (PRC et al., 1996), FS (PRC, 1996b), ROD (Navy, 1997), and Amended ROD (Navy, 2009).

### 3.2.3.1  Site Investigations and Removal Actions

Previous investigations at Parcel B identified the presence of metals, VOCs, SVOCs, pesticides, PCBs, and radionuclides in soil, groundwater, structures, and sediment.

After the initial ROD was signed, potential sources of mercury (IR-26, Parcel B-2) and methane (IR-07) were identified and subsequently removed via TCRAs in 2008 (Insight, 2009; SES-TECH, 2009). Post-removal action monitoring for mercury in groundwater and methane in soil gas was incorporated into the remedy as documented in the Amended ROD (Navy, 2009).

### 3.2.3.2  Human Health Risk

The most current HHRA for Parcel B was performed in support of the Amended ROD using data collected from previous investigations. Human health risks were characterized separately for COCs and ROCs. The following unacceptable risks to potential receptors from COCs were identified (**Table 3-1**):

- Future industrial workers from exposure to metals and SVOCs in subsurface soil (no unacceptable risks were identified for surface soil) and VOCs in groundwater (in A-aquifer through the vapor intrusion to indoor air pathway)

- Future recreational users from exposure to metals, SVOCs, and PCBs in surface soil

- Future residents (adult and child) from exposure to metals, VOCs, SVOCs, pesticides, and PCBs in surface and subsurface soil; to mercury, VOCs, and SVOCs in groundwater (A--aquifer through the vapor intrusion to indoor air pathway); and metals, VOCs, and pesticides in the B-aquifer through domestic use

- Future construction workers from exposure to metals, VOCs, and SVOCs in subsurface soil and metals, VOCs, SVOCs, and pesticides in groundwater

CH2M-0007-4930-0008

Additionally, ROCs were identified for soil and structures at Parcel B (**Table 3-2**) (Navy, 2009). Radionuclides of potential concern (ROPCs) and metals were identified as potential concerns for groundwater migrating to the bay within IR-07/18 if future development actions mobilize impacted soil left in place.

### 3.2.3.3  Ecological Risk

A screening-level ecological risk assessment (SLERA) was conducted in support of the ROD Amendment to evaluate potential ecological risks from exposure to shoreline sediment. The SLERA identified the following potential unacceptable risks to ecological receptors (**Table 3-1**):

- Sediment: Potential unacceptable risks to benthic invertebrates, birds, and mammals from selected metals, pesticides, PAHs, and PCBs in sediment along the Parcel B shoreline

- Groundwater: Potential unacceptable risk to aquatic organisms from mercury in groundwater under the assumption that groundwater mixes with surface water in San Francisco Bay; in addition, potential risks to ecological receptors from chromium VI, copper, lead, and nickel based upon review of groundwater data in the Amended ROD (Navy, 2009); metals not identified as COCs in the SLERA due to low frequency of detection and no defined plume, included for monitoring purposes

## 3.3    Remedial Action Objectives

The Parcel B ROD was signed on October 7, 1997 (Navy, 1997), two ESDs were signed on August 24, 1998 (Navy, 1998) and May 4, 2000 (Navy, 2000), and the Amended ROD was signed on January 14, 2009 (Navy, 2009).

**Table 3-3** summarizes the basis for action, RAOs, remedy components, performance metrics, and expected outcomes for Former Parcel B. The presence of VOCs in groundwater and soil may contribute to the presence of VOCs in soil gas; therefore, the vapor intrusion pathway is included as a basis for action and development of RAOs.

The Navy developed RGs to meet the RAOs for soil, sediment, and groundwater, which are summarized for COCs in **Table 3-1** and for ROCs in **Table 3-2**. The Navy also developed trigger levels (TLs) to evaluate attenuation of contaminants as groundwater moves from inland areas toward the bay. The TLs are as follows: 50 µg/L for chromium VI, 28.04 µg/L for copper, 14.44 µg/L for lead, and 0.6 µg/L for mercury in the surface water of San Francisco Bay. The TLs are conservative, and exceedance of a TL does not necessarily indicate an immediate risk, given dilution and mixing with surface water; nonetheless, a potential for ecological risk was identified if the metals in groundwater discharge undiluted to the bay.

## 3.4    Remedial Actions

This section presents a summary of the remedy implemented and ongoing O&M actions. Although there are a ROD and post-ROD decision documents for all of Parcel B, IR-07/18, Parcel B-1, and Parcel B-2 are managed independently and have individual protectiveness determinations, so they are evaluated individually.

### 3.4.1   IR-07/18

The RA for IR-07/18 includes the following major components:

- Soil excavation and removal to address COCs in soil
- Durable cover installation and maintenance to address COCs and ROCs in soil
- LTM of methane in soil gas

- LTM of groundwater for COCs and ROPCs
- Radiological surveys and remediation through soil removal and durable cover installation
- ICs for soil and groundwater

**Figures 3-1**, **3-2**, and **3-3** show the remedy components.

### 3.4.1.1  Remedy Implementation

**Soil Excavation and Removal**

Soil excavation was conducted in two phases after the initial ROD (**Figure 3-1**): from 1998 to 1999 and again in 2000 to 2001. Approximately 42,200 cubic yards of soil was removed from 25 areas between July 1998 and September 1999. However, RGs were not met, and an additional 27,700 cubic yards were removed from 10 areas between May 2000 and December 2001 (ChaduxTt, 2008). However, RGs were not met during the second excavation, and the Navy re-evaluated the approach in the Technical Memorandum in Support of a ROD Amendment (ChaduxTt, 2007) to include parcel-wide covers to address potential risk from remaining ubiquitous metals and other COCs at Parcel B (including IR-07/18), which was included in the Amended ROD (Navy, 2009). Responses completed for the soil RAOs applicable to IR-07/18, which includes soil excavation and removal, is documented in the RACR for IR-07/18 (ERRG, 2012a).

**Durable Cover Installation**

The construction of durable covers began in June 2010 and was completed in September 2011. Completion of the durable covers, along with implementation of ICs discussed in **Section 1.3.4.2**, meets the RAOs for soil applicable to IR-07/18. Response complete for soil is documented in the RACR for IR-07/18 (ERRG, 2012a).

Durable covers consist of shoreline revetment, soil covers, and asphalt covers at IR-07/18, as shown on **Figure 3-3** and described as follows:

- **Shoreline Revetment:** The shoreline revetment includes, from the bottom up, filter fabric, 6 to 12 inches of filter rock, and 2.5 to 3 feet of riprap. The filter fabric is designed to prevent migration of soil and sediment to San Francisco Bay; the filter rock and riprap layers protect the fabric from damage by wave action.

- **Soil Covers:** In the area identified as radiologically impacted in the Amended ROD (Navy, 2009), the cover includes, from the bottom up, 1 foot of clean imported soil, a demarcation layer that includes an orange geotextile and metallic demarcation tape placed over the fabric in a 10- by 10-foot grid, and 2 feet of clean imported soil for a total of 3 feet of cover. In areas not identified as radiologically impacted in the Amended ROD, the cover is composed of 2 feet of clean imported soil. The final cover includes surface completions for groundwater monitoring wells and methane monitoring probes, as well as stormwater drainage features.

- **Asphalt Covers:** An asphalt cover was constructed over a small area (about 60 feet by 130 feet) in the southeastern corner of IR-07 to allow for a more gradual transition to the final asphalt cover in the adjoining area of Parcel B-1. The asphalt cover included 2 inches of asphalt over 4 inches of aggregate base course.

**Long-term Monitoring of Methane**

The Navy conducted a TCRA to address methane in soil gas at IR-07 in 2008. The Navy excavated 17,000 cubic yards of soil, including the organic layer considered to be the source of methane in soil gas (ERRG, 2012a). Methane was not detected in any gas monitoring probes in

FIFTH FIVE-YEAR REVIEW REPORT
HUNTERS POINT NAVAL SHIPYARD, SAN FRANCISCO, CALIFORNIA
3.0 FORMER PARCEL B (INSTALLATION RESTORATION SITES 07 AND 18, PARCELS B-1 AND B-2)

samples collected semiannually since the probes were installed in November 2008. Response complete for soil gas was documented in the RACR for IR-07/18 (ERRG, 2012a), and the methane probes were decommissioned in 2012 (ERRG, 2012c).

**Groundwater Monitoring**

LTM was initiated in 2004 and is currently conducted under the BGMP. Groundwater sampling is conducted semiannually for metals (COCs) and ROPCs in two San Francisco Bay margin monitoring wells (IR07MW24A and IR07MW26A) to ensure that redevelopment does not mobilize contaminants that could migrate into the bay and adversely impact ecological receptors (Navy, 2010). Annual and semiannual groundwater monitoring reports from 2019 through 2022 were reviewed (TRBW, 2020b, 2020c, 2021, 2022a, 2022b, 2023).

Since at least 2009, concentrations of COCs and ROPCs have remained under their TLs, except for lead in September 2017 and March 2022 (TRWB, 2023). Concentrations of lead exceeded the TL but were within the same order of magnitude as the TL (14.44 µg/L) at two locations (23 and 23.9 µg/L) in March 2022 and were below laboratory detection limits during the September 2022 event (**Appendix E, Figure 3-5**). The TL exceedances have been infrequent during monitoring. During the last 5 years, lead was reported below the TL in April 2019 and September 2020. Lead was below laboratory detection limits in September 2019, May 2020, March 2021, September 2021, and September 2022. However, if concentrations consistently exceed a TL, the Remedial Action Monitoring Plan (RAMP) provides several additional evaluations that may occur, including increasing the frequency of monitoring, monitoring farther downgradient, using site-specific detailed information to more accurately estimate attenuation, or implementing a selected remediation alternative for groundwater treatment (ChaduxTt, 2010).

**Radiological Surveys and Remediation**

The Navy completed a Multi-Agency Radiation Survey and Site Investigation Manual (MARSSIM) Class 1 survey of the entire surface of IR-07/18, and the top 1 foot of soil was remediated in place to levels specified in the Amended ROD (Navy, 2009) before placement of the final cover. Material beneath the 1 foot was not remediated, requiring additional radiological ICs and the demarcation layer under the durable cover within the radiological IC area.

About 470 cubic yards of soil from the inland areas and additional sediment and debris (concrete, brick, and metal) from the shoreline were removed because cesium or radium concentrations exceeded RGs or because the waste was unable to be scanned and thus was assumed to be low-level radioactive waste (LLRW). No radiological releases were confirmed, and no radiological devices were discovered during any of the radiological surveys. In total, 109 LLRW bins (representing about 1,970 tons of waste) were removed and disposed of offsite as LLRW. In addition, about 5,390 tons of nonhazardous waste and 2,940 tons of non-Resource Conservation and Recovery Act hazardous waste were removed and disposed of offsite. The California Department of Public Health (CDPH) completed further surface scans at IR-07/18 before and after the soil cover was installed. CDPH concluded that there was no evidence or indication of radiological health and safety concerns based on surface gamma radiation in the surveyed areas of IR-07/18 (CDPH, 2013).

There are no buildings and there are no areas subject to radiological rework within the boundary of IR-07/18.

CH2M-0007-4930-0008

**Institutional Controls**

The entire area of IR-07/18 (about 14 acres) is subject to general soil and groundwater ICs. A portion of IR-07/18 (about 11 acres) is subject to ICs specifically related to radionuclides (**Figure 3-2**). IC performance objectives were developed and presented in the LUC RD (ChaduxTt, 2010). **Table 1-3** summarizes the IC performance objectives to be implemented through land use restrictions for the site.

### 3.4.1.2 Remedy Operations and Maintenance

Ongoing O&M at IR-07/18 includes maintaining the integrity of the soil cover, revetment, asphalt cover, and IC inspections. The inspection and maintenance requirements for the remedy are described in the Final O&M Plan (ERRG, 2012b). Annual Operation and Maintenance Summary Reports (AOMSRs) are prepared to summarize inspections and maintenance performed and to document the effectiveness of the remedy components. AOMSRs from 2019, 2020, 2021, and 2022 were reviewed (Innovex-ERRG Joint Venture, 2020, 2021a; APTIM, 2022, 2023).

**Durable Cover Maintenance**

Annual reports indicated the shoreline revetment was in good condition. No signs of vegetation or trash, pests, excessive vehicle traffic, settlement or movement, improper placement of fabric, vandalism or theft, cover soil overtopping, wave overtopping, or scouring were observed.

Annual inspections found the soil cover to be in good condition, with no signs of settling, slope failure, cracking, soil movement, or erosion. Minor evidence of burrowing animals was noted in one area of the parcel in 2019, further monitoring of this area has been performed since its inspection, and expansion of the burrowed area was not noted. Drainage swales within the soil cover were also found to be in good condition. Vegetation growth was well established over the soil cover, with no bare areas observed. Vegetation on the soil cover was mowed in August 2019, August 2020, and January 2022. No signs of excessive vehicle traffic on the cover were observed. No exposure of the demarcation layer was observed in any area, and no tree or deep-rooting plant growth that could compromise the demarcation layer was present on the soil cover. No signs of vandalism or settling were noted in the retaining wall area.

The asphalt cover was generally found to be in good condition. No signs of cracking of the curbs, vandalism, ponding, settlement, or excessive vehicle traffic were observed. Minor cracking (less than 0.25-inch width) was observed due to vegetation growth through seams in the asphalt cover. In areas of minor cracking, no asphalt repair was required; however, ongoing vegetation management and monitoring of the observed minor cracking are recommended. Vegetation growing through cracks in the asphalt pavement cover was removed in October 2020. Vegetation growth and damage was noted on the asphalt curve along Donahue Avenue in the 2021 Report (Aptim, 2022). In January 2022, the vegetation growth was removed, and the cracking was sealed using a rubberized asphalt crack filler.

The 2019 survey data for the settlement monuments indicated Monument 2 in IR-07/18 showed negligible change in elevation (that is, less than 0.1 foot of settlement) since surveyed in 2018. Based on the negligible change (less than 0.1 foot) in historical survey monument elevations, the next round of settlement monument surveys will be in 2024.

**Institutional Controls Compliance**

ICs are inspected annually, and no deficiencies or inconsistent uses were observed during the review. General site conditions were determined to be good. Remedy components, such as survey benchmarks and monitoring well vault covers, were found to be in good condition.

Navy controls access to the parcel using security fencing, signage, locks, and gates, which were found to be in good condition, with no signs of damage or vandalism. A breach in the chain-link perimeter fence along northeastern IR07/18 boundary was observed in 2019 resulting in fence repairs (Innovex-ERRG Joint Venture, 2020).

## 3.4.2   Parcel B-1

The RA for Parcel B-1 includes the following major components:

- Soil excavation and removal to address COCs in soil

- Durable cover installation and maintenance to address COCs in soil

- SVE to address VOCs in soil gas at IR-10

- In situ biological treatment to address VOCs in groundwater at IR-10

- LTM and MNA of groundwater for COCs

- Radiological surveys and remediation through soil excavation and sanitary sewer line and storm drain removal and through decontamination (and demolition/dismantling if necessary) buildings, structures, and former building sites

- ICs for VOC vapors

**Figures 3-1**, **3-2**, and **3-4** show the locations of major remedy components.

### 3.4.2.1   Remedy Implementation

**Soil Excavation and Removal**

Excavation and removal of soil containing COCs at concentrations greater than RGs were conducted from 2010 to 2011 (**Figure 3-1**). In total, approximately 25.5 loose cubic yards of soil was excavated from one hotspot area in Parcel B-1 to address lead in soil and was then disposed of offsite. The excavation was backfilled with clean imported soil. Completion of construction activities is documented in the *RACR for Soil Hotspot Locations at Parcel B, D-1, and G* (ERRG, 2011).

**Durable Cover Installation**

Construction of the durable covers at Parcel B-1 began in 2012 and was completed in 2015. Completion of the durable covers along with ICs discussed in **Section 1.3.4.2** meets the RAOs for soil at Parcel B-1. Response complete is documented in the RACR for the Durable Covers Remedy in Parcel B-1 (ERRG, 2017). Durable covers consist of shoreline revetment, soil cover, asphalt cover, and building foundations at Parcel B-1, as shown on **Figure 3-4** and described as follows:

- **Shoreline Revetment:** Shoreline revetment was constructed along the portion of Parcel B adjacent to IR-07/18 (ERRG, 2017). The shoreline revetment includes, from the bottom up, filter fabric, 6 to 12 inches of filter rock, and 2.5 to 3 feet of riprap. The filter fabric is designed to prevent migration of soil and sediment to San Francisco Bay; the filter rock and riprap layers protect the fabric from damage by wave action.

- **Soil Cover:** A vegetated soil cover was constructed on the hillside portions of Parcel B-1 (ERRG, 2017). The soil cover is composed of 2 feet of clean imported soil. The soil cover includes surface completions for groundwater monitoring wells and stormwater drainage features.

- **Asphalt Cover:** An asphalt cover was constructed over the remaining upland areas of Parcel B-1 (ERRG, 2017). The asphalt cover consists of 4 inches of aggregate base course overlain by 2 inches of asphaltic concrete. Drainage features such as swales, diversion berms, catch basins, and storm drainpipes were incorporated into the asphalt cover to convey stormwater offsite.

- **Building Foundations:** Cracks and penetrations in building foundations were repaired using a variety of materials, such as concrete, non-shrink grout, and asphaltic concrete, to prevent access to underlying soil (ERRG, 2017). Additionally, access to soil under buildings (for example, crawl spaces) was blocked with durable wire mesh.

## Soil Vapor Extraction at IR-10

The SVE system in Building 123 at IR-10 was originally installed in 2000 as a pilot study, was later expanded in 2005 as part of another pilot study, and was expanded again in May 2013 as part of the RA. The SVE system consists of a blower, blower motor, electrical panel, SVE wells, vapor monitoring wells, liquid/air separator, transfer pump, liquid storage tank, connection hoses, level switches, system interlocks and controls, and gauges (ERRG, 2015c).

The system operated intermittently after restarting in 2013. Concentrations of VOCs decreased to below soil gas action levels (SGALs) during operations and rebounded after every operating period within approximately 6 weeks. Overall, approximately 122 pounds of trichloroethene (TCE) was removed from the beginning of the system operations (December 2000) through the end of May 2019. The February 2018 to May 2019 operating period reported removal of approximately 7.22 pounds of VOCs and 6.62 pounds of TCE. The February 2018 to May 2019 report recommended additional long-term SVE operation at IR-10 be evaluated based on the diffusion-limited conditions, low mass removal rates, and operational costs associated with achieving RGs using this technology. An optimization review of the SVE remedy was recommended to determine whether other measures, such as remedy improvements or alternatives, can be implemented to enhance RA performance (Insight-ESI, 2023). The most recent operating period (October 2019 to April 2020) represented approximately 21 percent of the total operating period but removed approximately 1.4 pounds of TCE, or 1.2 percent of the total mass removal (Innovex-ERRG Joint Venture, 2021b).

The original intent of the SVE system was as a source-reduction measure, and the other actions associated with the remedy provide overall protectiveness to meet the RAOs (Navy, 2009). Evaluation of VOC mass removal rates and cumulative mass removed by the SVE system indicated that system operation reached a point of diminishing returns and, in general, appears to have had limited effectiveness in extracting significant VOC mass from subsurface soils. This is likely a result of low permeability and diffusion-limited soils. Therefore, soil excavation and subsequent confirmation monitoring is planned for IR-10 to address VOC soil contamination to a depth of 10 feet bgs (Insight-ESI, 2023).

## Biological Amendment Injection at IR-10

Groundwater remediation to treat the IR-10 VOCs plume in Parcel B-1 near Building 123 was conducted in 2013. Approximately 2,658 pounds of polylactate hydrogen release compound primer and 5,490 pounds of polylactate hydrogen release compound were injected into 45 groundwater injection points in March 2013 (ERRG, 2015). Approximately 152 pounds of polylactate substrate was injected at each location (approximately 7.6 pounds of polylactate substrate per vertical foot). Post-injection monitoring is currently ongoing under the BGMP.

CH2M-0007-4930-0008